THE CENTRAL RAILROAD COMPANY OF NEW JERSEY, PLAINTIFF BELOW, v. JOHN F. MacCARTNEY AND JOSEPH A. McELROY, PARTNERS, &c., PROSECUTORS.

Argued February 24, 1902—Decided June 9, 1902.

1. Where the consignor of goods on his own account contracts with a common carrier for their transportation, such consignor is *prima facie* liable to pay the charges of transportation, and the mere fact that the charges are left unpaid by the consignor and are to be collected from the consignee at destination, does not discharge the consignor from liability to the carrier.

2. The mere existence of the relation of carrier and consignee is not enough to establish a liability on the part of the latter to pay the freight charges. There must be an agreement by the consignee, express or implied, in order to create such a liability.

3. Where a common carrier, upon delivery of goods at destination, waives its lien for unpaid freight charges and permits the consignee to remove the goods, and the consignee, with knowledge of the fact that freight charges to a certain amount remain unpaid and that the carrier is giving up a lien thereon for his benefit, accepts the goods and removes them, such acceptance and removal are cogent evidence from which to imply an agreement on the part of the consignee to pay to the carrier the known amount of the freight charges.

4. But the mere acceptance and removal of goods by the consignee, with knowledge that the carrier is giving up for his benefit a lien upon the goods for a stated amount, does not create an obligation on the part of the consignee to pay charges beyond the amount stated.

5. Certain goods were sold upon terms requiring their transportation to destination at the expense of the seller, and a contract of shipment was thereupon made between the seller and a common carrier, by which the latter was to transport the goods to destination consigned to the purchasers. By the terms of this contract the transportation charges were not to be paid in advance by the consignor, but were to be collected by the carrier from the consignees at destination, and then charged by the consignees against the consignor when making payment to the consignor for the goods. The carrier at the same time had notice of the fact that by the terms of sale the consignor was to bear the entire charges for transportation, and that payment was to be made in the first instance by the purchasers merely as a matter of convenience; so that both as between consignor and carrier, and as between consignor and consignees, the consignor was liable to pay the charges of transportation. The common carrier delivered the goods to the consignees at destination, at the same time rendering to them statements of the charges for transportation, which statements, *through gross negligence on the part of the agents of the carrier,* were made out for sums considerably less than the just and correct amount of transportation charges. The consignees accepted and removed the goods, at the same time receiving the bills for transportation charges. About the same time the consignor rendered to the consignees a bill for the goods, having deducted therefrom transportation charges agreeing precisely in amount with those stated by the common carrier to the consignees. The consignees had no knowledge of the bargain made for freight charges, and no means of ascertaining the correct amount except through the carrier, and had no notice that the bills of charges were incorrect. A few days after receipt of the goods the consignees, in the ordinary course of business, paid to the carrier the amount of the transportation charges, and took the carrier's receipts upon the bills as rendered. Shortly thereafter the consignees, in the ordinary course of business, remitted to the consignor the balance due for the goods, after deducting the transportation charges as paid by them. Thereafter, the carrier, for the first time, discovered the

error in the amount of the charges as stated and collected. The carrier then called upon the consignees to pay the difference, and upon being refused brought this action against them. In view of the above facts, and it appearing that the consignor is a foreign corporation whose ability to pay is unknown—*Held,* that the plaintiff is estopped from recovering from the consignees the difference between the amount of charges as stated by it to the consignees, and the amount which, except for the gross negligence of the plaintiff's agents, would have been stated.

On *certiorari* to Somerset Common Pleas.

Before Justices FORT, HENDRICKSON and PITNEY.

For the plaintiff, *Pierre P. Garven.*

For the defendants, *Willard P. Voorhees.*

The opinion of the court was delivered by

PITNEY, J. This writ of *certiorari* brings before us for review a judgment of the Court of Common Pleas, rendered on appeal from a judgment of the Court for the Trial of Small Causes. The action was brought by the railroad company to recover an unpaid balance of transportation charges upon goods consigned and delivered to the defendants. The judgment in the Common Pleas was in favor of the plaintiff.

The facts of the case, as certified to us, are as follows: From July, 1897, to July, 1898, the defendants, MacCartney, McElroy & Company, were constructing a street railway between Bound Brook and Dunellen, in the county of Somerset. On July 2d, 1898, they contracted with one Phelan, agent of the Seaboard Tie and Lumber Company of Virginia, to purchase from that company three thousand railroad ties at a certain net price delivered at Bound Brook, and three thousand other ties at a certain net price delivered at Dunellen. The ties at the time of purchase were at Brooklyn, in the State of New York.

The court found that the shipper of the ties was the Seaboard Company, the ties being lightered from Brooklyn to Jersey City and there placed on board the cars of the plaint-

iff. The Seaboard Company, through its agent, Phelan, contracted with one Saville, who was in the lighterage business, and was also an agent of the plaintiff, to lighter the six thousand ties from Brooklyn to the plaintiff's terminus at Jersey City for three cents each, amounting to $180 for the entire number of ties. This agreement was made prior to the shipment of the ties. Accordingly the ties were lightered by Saville to Jersey City, and were there loaded on the cars of plaintiff and sent forward upon its railroad, consigned to the defendants—three thousand to Bound Brook and three thousand to Dunellen—for which the plaintiff charged, besides the lighterage, the customary rate of freight computed upon the weight of the ties. The court found the custom in the shipping and carrying of ties to be for the receiver (in this case MacCartney, McElroy & Company, the defendants), to pay the freight charges in the first instance, and to deduct the amount thereof from the invoice rendered by the shipper for the ties, and to remit to the shipper the balance only. This was "the custom existing between shippers and carriers," and the court found that "the freight, in this instance, by the custom among shippers and carriers, was to be deducted from the amount due for the ties, and the balance remitted to the seller."

One lot of three thousand ties was delivered to the defendants at Dunellen about July 9th, and at the same time the plaintiff's agent at that station delivered to the defendants a bill for freight, including lighterage and other charges thereon, amounting to $86.01. The remaining three thousand ties were delivered to the defendants at Bound Brook about July 11th, and at the same time the agent of plaintiff at that station delivered to the defendants a bill for freight, lighterage and other charges thereon, amounting to $94.26. About July 9th, 1898, the defendants received from Phelan a bill, in his handwriting, made out in favor of the Seaboard Tie and Lumber Company for the entire six thousand ties, amounting at the agreed price to $1,534.99, upon which bill there were deducted freight charges of $86.01 and $94.26, leaving a balance due of $1,354.72. On July 14th the defendants paid to

the railroad company the Dunellen freight bill of $86.01, and on July 26th paid to the company the Bound Brook freight bill of $94.26.   On August 12th, 1898, the defendants paid to the Seaboard Tie and Lumber Company the balance due upon the bill for ties rendered by Phelan, amounting to $1,354.72. Each of these bills appears to have been paid in the ordinary course of business, and receipts were duly taken upon the several bills as rendered.

Up to this time there was no knowledge on the part of defendants as to the rates of freight or lighterage agreed upon between their consignors and Saville or the plaintiff, nor had they received any communication from Phelan or any other person as to such rates, or any notice on the subject, aside from what was conveyed to them by the freight bills as rendered by the Dunellen and Bound Brook station agents, confirmed by the credit entered by Phelan upon the bill of the Seaboard Company for the ties.

In fact the bill clerk in the freight office of the plaintiff at Jersey City, whose duty it was to make out way-bills, committed an error in preparing the way-bills for the ties in question, entering the lighterage on each bill at $9 instead of $90.   From these way-bills the agents at Dunellen and Bound Brook, respectively, made out the freight bills, which were delivered to the defendants with the ties as above mentioned, and thereby perpetuated the bill clerk's errors.   The Dunellen freight bill, instead of $86.01 should have been $167.01, and the Bound Brook bill, instead of $94.26 should have been $175.26.   On each of these freight bills there was a column headed "Freight unpaid," in which was plainly set down in dollars and cents the freight, the lighterage and a charge for staking, and then, in the final column, at the right, under the head "To be collected at destination," was set down in dollars and cents the sum total of the former items.   In other columns, at the left side of the sheet, were set down successively the name of the consignor, the place from which the goods were consigned, the description, "3,000 R. R. ties," the weight in pounds and the rate at which the railroad freight charges were computed, which was not the rate per pound or per hun-

dred or per thousand pounds, but the rate per ton of two thousand pounds. In the column entitled "Rate" there was also, opposite an abbreviation of the word "lighterage," the figure "3," but nothing to show whether it was intended to mean three cents or three dollars. These bills, before they were paid, were checked by one of the defendants, but he did not observe the errors. The court below did not find, as matter of fact, that the freight bills contained upon their face anything sufficient to charge notice upon the defendants that there was an error in the computation, nor can we so find.

It appears from the facts as certified that the defendants had no understanding or communication with the railroad company regarding the freight rates. The contract was made solely between Phelan as agent of the consignor and Saville as representative of the railroad company. The error in making up the charge for lighterage was discovered by the railroad company a month or six weeks after the ties had been delivered and the bills rendered. It was not discovered until after the defendants had paid the freight bills and had also paid to the Seaboard Tie and Lumber Company the balance due for the ties. It appears that the railroad company paid Saville for the lighterage in two payments, "the first being $18 and afterwards the second being $162." It does not appear when these payments were made, but it is a necessary inference that the latter sum was paid to Saville after the discovery of the error in the freight bills.

The railroad company having notified the defendants of the error and called upon them to pay the difference of $162 between what was charged and what should have been charged, and the defendants having declined to make such payment, this action was brought and resulted in a judgment in favor of the plaintiff for $162, with interest. The question is, can this judgment be legally sustained upon the facts as found by the trial court?

It will be observed that while the findings of fact are clear upon the point that the agreement for transportation was made wholly between the consignor and the plaintiff, and that defendants had no notice as to the rates or amounts to be

charged until they actually received the ties, there is no finding either *pro* or *con*, upon the question whether defendants had notice of and assented to the custom requiring transportation charges to be paid in the first instance by the consignee. It is found that such a custom existed "between shippers and carriers," but the defendants were neither. Nor does it appear that they had ever received ties or other freight on those terms before. The court also found that the freight in this instance, by the custom, was to be deducted by the purchasers from the bill for ties, and the balance remitted to the seller. Whether this was the arrangement made simply between the consignor and the plaintiff or whether the defendants assented thereto is not distinctly certified. What inference is properly to be drawn upon this point from the facts that are found is a matter of some doubt. We will therefore discuss the case in both aspects.

In the first place, therefore, supposing nothing had occurred to bind the defendants prior to their receipt of the ties, it is not perceived that they have made any promise or undertaking such as to subject them to liability in any amount beyond the sums specified upon the freight bills that were rendered at the delivery of the ties. The amounts thus specified they have already paid. In the absence of some agreement on the part of defendants, either express or implied, there is, in our opinion, nothing to support the present action. The mere existence of the relation of carrier and consignee is not enough to establish an obligation upon the latter to pay the transportation charges.

*Prima facie,* the consignor of freight who contracts with the carrier for its shipment is liable to pay the charges of transportation. It is by him that the engagement is made with the carrier; it is for him that the service is performed.

The question of his liability, however, is in each instance dependent upon the terms of the agreement actually made between him and the carrier. Whether the consignor is shipping for his own account or as agent of another; whether he is owner of the goods; whether by the agreement between him and the consignee the title to the goods passes to the latter at

the time of delivery to the carrier or upon delivery to the consignee; these and other like circumstances have been discussed in the adjudicated cases as evidential upon the question of consignor's liability to the carrier for the freight.

In the present case the facts leave no room to doubt the consignor's original liability. Not only did the seaboard company, through its agent, engage the transportation and agree with the plaintiff's agent about the terms thereof; not only was this done without the knowledge or participation of the defendants, but by the very terms of sale the ownership of the ties was to remain in the consignor until their delivery at Dunellen and Bound Brook, respectively; and of this the carrier had notice, as will be shown presently.

The freight charges being unpaid in advance by the consignor, the carrier was, of course, entitled to a lien upon the goods for the amount of the freight. It was not obliged to make delivery to the consignees until these charges were paid. In such a case, if the lien is waived and the goods delivered to the consignee, accompanied with notice to him of the amount of the charges remaining unpaid, the decisions hold that acceptance of the goods under such circumstances either amounts to an agreement to pay the freight or at least is evidence from which such an agreement may properly be inferred. But acceptance by the consignee, although accompanied by an undertaking to pay the charges, does not discharge the consignor from liability to the carrier. The two contracts are held to be independent and not inconsistent one with the other.

The above propositions, so far as they affect the consignor's liability, were fully discussed in the case of *Grant* v. *Wood*, 1 *Zab.* 292. Upon the general question the following additional decisions may be referred to: *Cock* v. *Taylor*, 13 *East* 399; *Shepard* v. *Bernales, Id.* 565; *Wilson* v. *Kymer*, 1 *Mau. & Sel.* 157; *Sanders* v. *Van Zeller*, 4 *Ad. & E.* (*N. S.*) 260; *Wegener* v. *Smith*, 15 *C. B.* 285 (80 *Eng. Com. L.*); *Barker* v. *Havens*, 17 *Johns.* 234; *Merrick* v. *Gordon*, 20 *N. Y.* 93, 97; *Davis* v. *Pattison*, 24 *Id.* 317; *Dart* v. *Ensign*, 47 *Id.* 619; *Davison* v. *City Bank*, 57 *Id.* 81; *Elwell* v. *Skiddy*,

*77 Id.* 282; *Boston and Maine Railroad Co.* v. *Witcher,* 1 *Allen* 497; *Finn* v. *Western Railroad Corporation,* 112 *Mass.* 524; *Old Colony Railroad Co.* v. *Wilder,* 137 *Id.* 536; *Union Freight Railroad Co.* v. *Winkley,* 159 *Id.* 133; *S. C.,* 34 *N. E. Rep.* 91; 55 *Am. & Eng. R. R. Cas.* 695.

Upon reason, as well as by the great weight of authority, it seems entirely clear that the liability of the consignee to pay to the carrier the freight upon the goods transported, in a case such as is here presented, depends not upon any general legal duty resting upon a consignee simply because he is a consignee, but upon some agreement or undertaking made on his part. Where one accepts delivery of goods from a common carrier, receiving at the same time a statement plainly setting forth the amount of freight charges thereon, with knowledge that the carrier is giving up for the benefit of the consignee a lien upon the goods for the amount so stated, such conduct by the consignee is, of course, cogent evidence, and, standing unexplained and uncontradicted, is sufficient evidence of an implied promise to pay the amount of the stated charges.

Such an undertaking was undoubtedly made by the defendants in this case. That undertaking has been performed by them. But we fail to see, in the facts as certified to us by the trial court, anything to support a finding that the defendants, by anything that transpired at or after the delivery of the ties, undertook and promised to pay freight charges indefinite in amount, or any sum beyond that which was stated on the bills as rendered.

If the plaintiff, the railroad company, instead of waiving its lien had insisted upon retaining the ties until payment of the freight, at the same time rendering to defendants the freight bills, as, in fact, they were rendered, and if the defendants had thereupon paid the bills in order to secure the ties, could a further liability be imposed upon them simply on the ground that the bills as rendered did not include the entire charges? We think not. In such case the plaintiff would have been left to its action against the consignor, as the party on whose engagement the service was performed.

But, secondly, whether the defendants were or were not originally cognizant of the terms of shipment so as to be bound in the first instance to pay the just amount of transportation charges, the plaintiff is, in our opinion, estopped from demanding any greater sum than was demanded when the ties were delivered.

As already mentioned, the facts show a custom between shippers and carriers, in view of which the agreement was made between Phelan, the agent of the shipper, and Saville, the agent of the carrier (he at the same time appearing to have contracted as an individual with respect to the lighterage charges). The agreement was in effect that payment of the lighterage charges should not be exacted of the shipper in advance, but that they should be added to the charges for transportation over the railroad and collected by the railroad company from the consignees at destination; and the consignees were then to deduct the charges thus paid by them from the amount due to the consignor for the ties and remit the balance to the consignor. It will be observed that by the very terms of the agreement notice was conveyed to Saville, and through him is imputable to the plaintiff, to the effect that the consignor was the seller of the ties and was bound, by the terms of sale, to bear the entire charges of transportation, payment being made in the first instance by the purchasers merely as a matter of convenience to all parties. At the same time it was a matter of entire indifference to the defendants, as consignees and purchasers, whether the transportation charges were greater or less, provided they were notified of the correct amount prior to their closing the account with their consignor. They were entitled to charge the freight against the agreed price of the ties as so much money paid for the use of the consignor and at its request. Aside from this there is nothing to show that the defendants had any authorization from the consignor to pay money for its account.

The whole situation was such as to render it, in common fairness, quite essential that the railroad company should furnish correct freight bills at the time of delivery of the ties if they desired to hold the defendants personally liable for the

freight. The error in the freight bills was the result of gross negligence on the part of the agents of the plaintiff. Can the defendants be made to suffer for it?

The doctrine of equitable estoppel, although the creature of equity and depending upon equitable principles, is recognized and enforced alike by the courts both of law and of equity. *Pom. Eq. Jur.,* § 802. For an ample discussion of its principles and their application, reference may be had to Mr. Pomcroy's treatise, *Id.* §§ 801, 821; *Big. Estop.* (*5th ed.*) 570 *et seq.;* 11 *Am. & Eng. Encycl. L.* (*2d. ed.*), *tit. "Estoppel"* 385, &c.

The courts of this state have been called upon to deal with the doctrine in all its phases. Among other cases, the following may be mentioned: *Den* v. *Baldwin,* 1 *Zab.* 395, 403; *Martin* v. *Righter,* 2 *Stock.* 510, 526; *Philhower* v. *Todd,* 3 *Id.* 312; *Phillipsburg Bank* v. *Fulmer,* 2 *Vroom* 52, 55; *Campbell* v. *Nichols,* 4 *Id.* 81, 87; *Kuhl* v. *Mayor of Jersey City,* 8 *C. E. Gr.* 84; *Swayze* v. *Carter,* 14 *Stew. Eq.* 231; *Mutual Life Insurance Co.* v. *Norris,* 4 *Id.* 583; *Hart* v. *Kennedy,* 2 *Dick. Ch. Rep.* 51, 61; *Perkins* v. *Moorestown and Camden Turnpike Co.,* 3 *Id.* 499, 505; *Ruckelschaus* v. *Oehme, Id.* 436; *S. C.,* 4 *Id.* 340; *Robeson* v. *Robeson,* 5 *Id.* 465; *Lawson* v. *Carson, Id.* 370; *S. C. on appeal, Lawson* v. *Nicholson,* 7 *Id.* 821; *Ruckelshaus* v. *Borcherling,* 9 *Id.* 344; *Magie* v. *Reynolds,* 6 *Id.* 113; *Mott* v. *Newark German Hospital,* 10 *Id.* 722, 733; *Van Marter* v. *Lucas,* 35 *Vroom* 182.

The essential elements which must unite in order to create an equitable estoppel by conduct may be stated with approximate accuracy, as follows:

1. That the party against whom the estoppel is urged has, on a previous occasion, by words or conduct, made a representation or concealment of material facts inconsistent with the facts forming the basis of his present claim.

2. That such party either knew the facts to be otherwise than represented, or except for gross negligence would have known; or that he pretended to know the facts when he knew that he did not know them.

3. That such representation or concealment was made either with the intent to influence the conduct of another or else was made under such circumstances that a reasonably prudent man would suppose it was intended to be acted upon as true.

4. That the party to whom it was made was ignorant of the facts and had no convenient opportunity to ascertain 'them.

5. That the latter party, in good faith, relied upon the representations or conduct of the other party and thereby was led into such a course of conduct that he will now be substantially prejudiced if the other party be permitted to repudiate his former action or representation.

In short, an equitable estoppel prevents one from rectifying his own grossly negligent mistake at the expense of another who has, without negligence, been misled thereby.

The facts of the present case make it in all respects a typical case for estoppel. The agents of the plaintiff, the Central Railroad Company, by rendering to defendants bills made out in regular form, represented the amount of all freight charges (including lighterage) to be $86.01 and $94.26, respectively. The agents of the plaintiff (of whom Saville was one, and the bill clerk in Jersey City another) either knew or except for gross negligence would have known, the correct charges to be $81 greater in each case. As to the intent, the certificates of facts found by the Court of Common Pleas sets forth that "no intention to influence or mislead the defendants was proved." Of course there was no intention to mislead. The error was a sheer mistake in the sense of being unintentional. But the facts specifically found evince an intent to "influence" the defendants to pay to the plaintiff the freight and other charges as stated, and to settle with their consignor on that basis. As already appears, the railroad company was charged with notice that the freight, &c., were to be paid by the defendants simply as a matter of accommodation, the party really liable being the consignor. Any reasonably prudent man, in the position of the plaintiff, would have known that the defendants would accept the freight bills as accurate and reliable for the purposes of a settlement with their consignor, and any reasonably prudent man, in the position of the defendants,

would have done what they did—that is, paid the bills and charged them up to the consignor in the settlement. The defendants, of course, had no means of ascertaining the freight charges except from the railroad company. They had nothing to do with making the bargain for transportation or with fixing the rate; nor does it appear that, until arrival of the ties and receipt of the freight bills, they knew the weight of the ties or knew that lighterage was to be charged separately from railroad charges. About the time they received the freight bills from the railroad company they received from the Seaboard Company, through Phelan, a bill for the ties, with the amount of the freight bills deducted. The amounts of these agreed exactly with the bills as rendered by the railroad company, showing to the defendants that Phelan must have secured his information from the railroad company. It is quite possible, as argued in behalf of the plaintiff, that Phelan knew the true amount of the charges. Of course he knew the agreed lighterage charge at least. But Phelan was not acting for the defendants in any way. And when the defendants received from him, as representative of their consignor, a statement which agreed precisely with that rendered by the railroad company, the defendants were entitled to act upon the information as correct, in the absence of notice of the error, and such notice they did not have. They themselves were not concerned as to the amount of the freight bills, being with respect to them merely stakeholders. And when the party entitled to payment and the party chargeable with the payment agreed in their statements as to the amounts payable, there was nothing to put the defendants on their guard.

By means of the representations of the plaintiff the defendants were led to change their position. Not that payment of the freight bills would have completed the estoppel, but when the defendants, in reliance upon the correctness of the freight bills, after paying them and receiving the plaintiff's receipts therefor, proceeded, in good faith, to close accounts with their consignor, deducting the freight bills as agreed and paying over the balance due for the ties, the estoppel was complete,

for it appears that thereby the defendants parted with the very fund against which alone they had a right to charge the freight. The case does not show that they could now recover over against the Seaboard Company the amount of the judgment in this suit, if forced to pay it. At least their right of action is far from clear. , Moreover, the Seaboard Company is a foreign corporation and its responsibility is unknown. If it can be compelled to pay the unpaid lighterage, pursuant to its original agreement with the plaintiff, it is quite proper, under the circumstances, for the plaintiff to be left to make that collection by direct proceeding and at its own expense.

Let the judgment below be reversed, and final judgment be entered in favor of the defendants, with costs.