NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY
*vs.* YORK AND WHITNEY COMPANY.

Suffolk.   December 4, 5, 1917. — May 24, 1918.

Present: RUGG, C. J., BRALEY, CROSBY, PIERCE, & CARROLL, JJ.

*Practice, Civil,* Agreed statement of facts.   *Carrier,* Of freight.   *Interstate. Commerce.   Bill of Lading.*

An action of contract by a railroad corporation for certain freight and other charges was tried before a jury on an "agreed statement of facts," which contained statements that certain persons would testify as there narrated, and the defendant "introduced in evidence the original freight bills" of which copies were annexed to the agreed statement of facts and "There was no further evidence offered on either side."   The jury returned answers to special questions submitted to them by the presiding judge.   *Held,* that the

record showed that the case was tried upon the statement of agreed facts submitted as evidence, which with other evidence was the basis from which the ultimate decisive facts so far as necessary must be determined.

In the case described above it also was *held* that, where more than one rational inference could be drawn from the evidence as stated, a question of fact for the jury was presented, and the only question of law in regard to such an inference was whether the jury's finding of fact was warranted.

The provisions of the interstate commerce law as to rates are applicable only to those who expressly or by implication are or become parties to the contract of transportation.   Whether one is or has become a party to that contract must be determined by the general principles of the common law.   By RUGG, C. J.

Where perishable produce is shipped under a "straight" bill of lading in the form established by the interstate commerce commission but the bill of lading is retained by the shipper, and the consignee, who is not a party to the bill of lading and does not know its terms, notifies the carrier upon the arrival of the goods that he is not their owner but is merely an agent to sell the goods on commission and asks the carrier for the amount of the charges in order to decide whether he will receive or decline to accept the consignment, if the carrier names an amount less than the rates established by the tariffs filed and published in compliance with the interstate commerce act, and the consignee thereupon in good faith pays the amount named and receives the goods, he is not bound by the terms of the contract to which he was not a party and of which he had no notice.

In the case in which the point above stated was decided, it was *said* that it was not necessary to consider what would have been the rights and obligations of the parties if the bill of lading had contained the express stipulation that the consignee alone should pay the freight as a condition precedent to delivery to him.

Where, however, the consignee of such perishable produce, not its owner but merely an agent to sell it on commission and not a party to the bill of lading, before the shipment was made wrote to the freight traffic manager of the carrier asking for the rates on such perishable produce, and received a reply from the freight agent giving the correct rates with specific references to the published tariffs, which would have enabled him by a simple computation to know the amount of the lawful charges, and thereafter the consignee accepted and received certain carloads of the perishable produce, paying lower charges named to him by the local freight agent of the carrier on the arrival of the goods, it was *held*, that a finding was warranted that the consignee knew and expected to pay the legal tariff rates and accepted the goods understanding that the carrier required the payment of the legal charges, and accordingly that upon those shipments he was liable to pay to the carrier the balance above the undercharges.

In the action in which the points above stated were decided, it appeared that the defendant was not only a commission merchant but was also at all times a dealer in fruit and produce in Boston, and that as to three carloads of fruit consigned to him, which he received on paying less than the established interstate charges for freight and refrigeration, he gave no notice that he was not the owner but was only an agent to sell on commission, and there was some evidence that he was the owner.   The railroad corporation brought the action against him to recover the balance of the legal charges above the undercharges paid by him.   *Held,* that under the circumstances shown the plaintiff had the right to treat the

defendant as the owner of these three carloads of fruit and that the jury were warranted in drawing the inference and consequently finding that the defendant impliedly agreed to pay the established interstate charges. Following *New York, New Haven, & Hartford Railroad* v. *York & Whitney Co.* 215 Mass. 36.

CONTRACT on an account annexed by a railroad corporation to recover balances, amounting in all to $652.36, alleged to be due for freight and refrigeration charges on certain carloads of cantaloupes, "pie plant" and peaches shipped in interstate commerce and consigned to the defendant at Boston. Writ dated May 16, 1914.

The account annexed contained nine items.

The first item, dated August 31, 1911, was for freight and refrigeration charges on a carload of cantaloupes, $330.69, less paid on account $222.20, leaving a balance of $108.49.

The second item, dated September 1, 1911, was for similar charges on another carload of cantaloupes, $333.05, less paid on account $224.45, leaving a balance of $108.60.

The third, fourth, fifth and sixth items were like the second, except as to the dates, which were respectively September 2, 4, 5 and 11, 1911, and except the amount of the sixth item, which was $331.11, less paid on account $232.35, leaving a balance of $98.76.

The seventh item, dated April 28, 1912, was for icing car containing pie plant, $1.25.

The eighth item, dated September 12, 1912, was for icing car containing peaches, $5.

The ninth item, dated September 13, 1912, was for icing car containing peaches, $5.

The defendant's answer, among other matters, set up a claim in recoupment based on alleged negligence of the plaintiff in computing the freight and other charges upon the shipments set forth in the items of the plaintiff's account annexed.

In the Superior Court the case was tried before *Bell, J.,* on an agreed statement of facts and the originals of the freight bills, introduced in evidence by the defendant, of which copies were annexed to the agreed statement of facts, and no further evidence was offered on either side. The substance of the facts stated and the inferences that the jury were warranted in drawing are described in the opinion.

After the parties had rested, the defendant moved that a verdict

be ordered for the defendant generally and also separately upon each item of the account annexed. The plaintiff also moved that a verdict be ordered for the plaintiff for the full amount claimed in the declaration.. The judge refused to make at that time any rulings upon these motions and stated to the counsel that he desired to have the jury pass upon certain issues before making any rulings. Both parties excepted. Thereupon the judge framed and submitted to the jury on all the evidence thirty questions, which, with the answers of the jury, were as follows:

"1. Did or did not the defendant receive the letter from Van Ummersen, general freight agent, dated September 14, 1911?" The jury answered, "Yes."

"2. If the jury answer interrogatory 1 'yes,' on what day was the same received by the defendant?" The jury answered, "September 15."

"3. Was or was not the plaintiff notified by the defendant before delivery to the defendant of any of the six carloads of cantaloupe that the defendant was not the owner of said six carloads, but was merely receiving them in its capacity as commission merchant and as agent for the shipper?" The jury answered, "Yes."

"4. Did or did not the defendant accept the first carload of cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "No."

"5. Did or did not the defendant accept the second carload of cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"6. Did or did not the defendant accept the third carload of cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"7. Did or did not the defendant accept the fourth carload of cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"8. Did or did not the defendant accept the fifth carload of

cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"9. Did or did not the defendant accept the sixth carload of cantaloupe understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"10. Did or did not the defendant accept the carload of pie plant understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"11. Did or did not the defendant accept the carload of peaches described in the eighth item of the account annexed to the declaration understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"12. Did or did not the defendant accept the carload of peaches described in the ninth item of the account annexed to the declaration understanding that the plaintiff looked to the defendant for the payment of all freight and other lawful transportation charges thereon?" The jury answered, "Yes."

"13. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges, as set forth in the first item of the account annexed to the declaration?" The jury answered, "No."

"14. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges, as set forth in the second item of the account annexed to the declaration?" The jury answered, "Yes."

"15. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges, as set forth in the third item of the account annexed to the declaration?" The jury answered, "Yes."

"16. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges, as set forth in the fourth item of the account annexed to the declaration?" The jury answered, "Yes."

"17. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges,

as set forth in the fifth item of the account annexed to the declaration?" The jury answered, "Yes."

"18. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of freight and transportation charges, as set forth in the sixth item of the account annexed to the declaration?" The jury answered, "Yes."

"19. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of icing charges, as set forth in the seventh item of the account annexed to the declaration?" The jury answered, "Yes."

"20. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of icing charges, as set forth in the eighth item of the account annexed to the declaration?" The jury answered, "Yes."

"21. Did or did not the defendant impliedly agree with the plaintiff to pay the balance of icing charges, as set forth in the ninth item of the account annexed to the declaration?" The jury answered, "Yes."

"22. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the first item of the account annexed to its declaration?" The jury answered, "Yes."

"23. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the second item of the account annexed to its declaration?" The jury answered, "No."

"24. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the third item of the account annexed to its declaration?" The jury answered, "No."

"25. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the fourth item of the account annexed to its declaration?" The jury answered, "No."

"26. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the fifth item of the account annexed to its declaration?" The jury answered, "No."

"27. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the sixth item of the account annexed to its declaration?" The jury answered, "No."

"28. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the seventh item of the account annexed to its declaration?" The jury answered, "No."

"29. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the eighth item of the account annexed to its declaration?" The jury answered, "No."

"30. Is or is not the plaintiff estopped from maintaining its claim against the defendant as set out in the ninth item of the account annexed to its declaration?" The jury answered, "No."

Both parties excepted to the rulings of the judge that there were issues of fact to be submitted to the jury, but no question was raised and no objection was made to the form of the questions so submitted.

Both parties asked the judge to make certain rulings, some of which he made and some of which he refused, subject to the exception of the requesting party.

After the answers of the jury had been received the defendant filed a motion that certain of the answers be set aside and the issues on which they were given be discharged. The judge, after hearing, denied the motion.

The judge ruled that the plaintiff could not recover on the first item of the account annexed, but ordered a verdict for the plaintiff on the remaining eight items amounting to $543.87 principal and $175.13 interest, making a total of $719.

After the return of the verdict as ordered and before the recording thereof, the judge reserved leave, with the consent of the jury, to enter a different verdict if, upon the exceptions taken or the questions of law reserved, this court should decide that such different verdict should have been entered. Thereupon by the agreement of both parties the judge reported all questions of law raised upon the record for determination by this court. If his rulings were correct judgment was to be entered for the plaintiff on the verdict, but if his rulings in whole or in part were wrong such judgment was to be entered or order made as ought to have been entered or made.

*W. L. Parsons*, for the plaintiff.

*A. L. Taylor*, for the defendant.

RUGG, C. J. This case comes before us on a report, which states that it was tried before a jury on an "Agreed Statement of Facts," which covers with its exhibits more than twenty printed pages. Several of its paragraphs begin with the statement that certain persons "will testify" as narrated. The report fur-

ther says that the defendant "introduced in evidence the original freight bills. . . . There was no further evidence offered by either side." It follows that the case was tried upon the statement of agreed facts submitted as evidence, which, together with the other evidence, was the basis from which the ultimate decisive facts so far as necessary must be determined. Where more than one rational inference can be drawn from these, a question of fact is presented. It is when only one conclusion is possible that a point of law alone is raised. *Frati* v. *Jannini*, 226 Mass. 430, 432. *Atlantic Maritime Co.* v. *Gloucester*, 228 Mass. 519, 522, 523. See *Donahoe* v. *Turner*, 204 Mass. 274.

This is an action of contract to recover a balance claimed to be due for freight and refrigeration charges on various carloads of produce shipped in interstate commerce and consigned to the defendant at Boston. The plaintiff as the terminal carrier failed to collect the full amount of the correct tariff rates at the time of delivery. One group of the shipments relates to six carloads of cantaloupes originating at Payette, Idaho. "Straight Bills of Lading" in the form established by the interstate commerce commission were issued for those cars, each signed by the shipper and by the agent of the carrier, but they all were retained by the shipper, never came into the possession of the defendant, and it had no actual knowledge that any had been issued or of the terms thereof. Immediately upon being informed of the arrival of the first of these six cars, an agent of the defendant inquired of an agent of the plaintiff what the freight charge was, saying also that the six carloads of cantaloupes expected by the defendant from Payette, Idaho, "were commission goods and that the defendant wished to know what the charges would be before it decided to accept the consignment." Information later was given to the defendant that the rate was $222.20, which was $108.49 less than the lawful rate established by the tariffs filed with the interstate commerce commission.

It is not now open to discussion that the rates published according to the requirements of the federal interstate commerce act are absolutely binding upon all persons who are parties to a contract of interstate transportation. They have the force of a statute. They cannot be varied under any pretext. The carrier cannot lawfully depart from them. It was said in *Kansas City*

*Southern Railway* v. *Carl,* 227 U. S. 639, at page 653, "Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed." It was "the purpose of the act to have but one rate, open to all alike and from which there could be no departure." *Louisville & Nashville Railroad* v. *Maxwell,* 237 U. S. 94, and cases collected at page 97. *Dayton Coal & Iron Co. Ltd.* v. *Cincinnati, New Orleans & Texas Pacific Railway,* 239 U. S. 446. *Pennsylvania Railroad* v. *International Coal Mining Co.* 230 U. S. 184, 197. It was said in *Erie Railroad* v. *Stone,* 244 U. S. 332, at page 336, "The rules and regulations, duly published and filed, which in any wise affect the rates or the value of the service to be rendered are controlling upon both parties to the shipping contract. (Act of June 29, 1906, 34 Stat. 586, § 2.) The binding force of these contracts and regulations has been affirmed in many cases." *Boston & Maine Railroad* v. *Hooker,* 233 U. S. 97, 112. *Pierce* v. *Wells Fargo & Co.* 236 U. S. 278, 284, 285. *Southern Railway* v. *Prescott,* 240 U. S. 632, 638.

The question is, whether these rates are binding upon a consignee who is not a party to the bill of lading, who notifies the carrier that he is not the owner of the goods transported, but merely an agent to dispose of them on commission, and who decides, after having had stated to him by the carrier the amount of charges said by it to be due, whether he will receive or decline to accept the consignment. More broadly stated the question is, whether everybody who deals with an interstate shipment, although not the owner of the goods, is bound inexorably to know and to pay the lawful and correct rates established by the tariffs filed and published in compliance with the interstate commerce act, even though he is not a party to the shipment, is not bound to pay any rate at all except by his own volition exercised after the shipment is in progress or at an end, and decides to pay only on the assumption that the charge stated by the carrier is the extent of his obligation. This point relates to the interpretation of an act of Congress, respecting which a decision by the Supreme Court of the United States is final and binding upon all other courts. This precise point has not been decided by that court so far as we are

aware.  We must, therefore, decide it upon what appear to be the
governing principles of law in the light of the decisions of that
tribunal upon kindred and analogous questions.

The decisions already cited have settled that parties to an inter-
state shipment or carriage are bound, the carrier to collect and
the shipper or owner to pay, the lawful rate no matter what mis-
take or misunderstanding may have entered into any statement of
the rate.  Congress has determined that the true and lawful rate,
fixed according to the methods prescribed by it, shall have the
force and effect of a statute and shall be immutable by any conduct
of the parties.  That principle has been stated in the strongest
possible form of expression.

There is ground for holding that the same principle should
apply to all persons who may seek to deal with goods transported
by interstate carriage to the extent of paying the charges for
transportation.  The purpose of the act being, as has been stated
many times in various forms of words, to prevent utterly any
discrimination between different shippers in interstate commerce,
and to put everybody absolutely upon the same footing as to the
rates in interstate commerce, there is much to be said in favor of
the proposition that everybody, whether a party or a stranger to
the contract for shipment, must pay the one and only legal rate
if he undertakes to pay any rate at all.  It may be that the evil
of discrimination in rates can be exterminated only by such
drastic interpretation.

But the reasons against this view seem to us stronger.  Trans-
portation of goods in interstate commerce rests upon contract.
Nobody is under legal compulsion to enter into such a contract.
It is an economic adventure.  Whether one shall enter into it
depends in large measure, if not entirely, upon business considera-
tions and a determination whether it will be profitable or not.
After one enters into such a contract, he is bound by law as to the
rate.  The shipper both theoretically and practically has within his
reach the facilities for ascertaining the lawful rate, because every
carrier is required by section 6 of the act (as amended by the act
approved June 29, 1906) to keep schedules of rates and charges
"posted in two public and conspicuous places in every depot,
station, or office . . . where passengers or freight, respectively,
are received for transportation, in such form that they shall be

accessible to the public and can be conveniently inspected." It is true that the schedule becomes operative upon filing with the interstate commerce commission and furnishing copies to its officers even though not thus publicly posted. *Texas & Pacific Railway v. Cisco Oil Mill,* 204 U. S. 449, 451 n.

But it is the theory of the law that opportunity to ascertain the true rate must be open to one who wants to make a contract, the profit or loss of which may depend wholly upon the rate. The shipper is a necessary party to the contract for interstate shipment. Goods cannot be carried unless some one sends them. He must be bound to pay the lawful rate, unless by the contract of transportation, manifested usually by the bill of lading, he is not liable for any rate. But the consignee is not a necessary party to a contract for interstate shipment. The same opportunity is not or may not be open to him under the law to ascertain the true and lawful rate. That is illustrated by the facts in the case at bar. No through rate had been established on cantaloupes from Payette, Idaho, to Boston. So far as known, melons had never before been shipped from Idaho to Boston. The lawful rate could be found only by adding the rate of the Oregon Short Line Railroad from Payette to Chicago, and the rates of the Lake Shore and Michigan Southern Railroad and other railroads from Chicago to Boston. Those rates were to be found by examination of the tariffs issued by these several railroads. It is common knowledge that neither of these railroads above named maintain tracks in this Commonwealth, and hence there is no place here where these rates are required by the law to be posted publicly. No practicable means, therefore, were open to the defendant to ascertain the lawful rate on the carload of perishable goods such as cantaloupes within such time as would enable it to receive and sell the goods before they would become worthless. It never had had anything to do with the shipper. The whole question, whether it could afford to receive the cantaloupes on consignment, depended on the freight charges to be paid. Under these circumstances, the only way in which the business could go forward was for it to take the word of the carrier as to the charge to be paid.

It seems to us more rational to hold that the inexorable provisions of the federal law as to rates are applicable only to those who expressly or by implication are or become parties

to the contract of transportation. Whether one is or has become a party to that contract must be determined by the general principles of the common law. As was said in *Cincinnati, New Orleans & Texas Pacific Railway* v. *Rankin,* 241 U. S. 319, 326, 327, "The shipment being interstate, rights and liabilities of the parties depend upon acts of Congress, the bill of lading, and common law rules as accepted and applied in federal tribunals." A consignee who is not the owner of goods, and who is to receive them only on commission, and who notifies the carrier to this effect, is not thereby necessarily a party to the contract of carriage. It was said by Chief Justice Bigelow in *Boston & Maine Railroad* v. *Whitcher*, 1 Allen, 497, at page 498, "no case can be found which goes the length of holding, that an agent is liable for the freight of goods sent to and received by him, when his agency is known to the carrier at the time of the delivery of the goods, and when there is no stipulation in the contract of transportation by which the consignee is to pay the freight. In such a case, the essential elements of a contract are wanting. There is nothing from which an intent on the part of the shipper or carrier to charge the agent, or an agreement by the agent to pay the freight, can be inferred. A mere naked consignment to an agent does not make him liable for the freight, where the agency is known, and there is no stipulation that the consignee shall pay freight." *Old Colony Railroad* v. *Wilder*, 137 Mass. 536.

The bill of lading as to the first car never was sent to the defendant, and it did not know its terms. Since it is required by § 20 of the act as amended by the Carmack amendment, (34 U. S. Sts. at Large, 593,) that a bill of lading or receipt must be issued by the carrier, the defendant must be presumed to know that. But the defendant cannot be presumed to know the terms of the bill of lading. If it be assumed in favor of the plaintiff that the defendant was bound to know also the terms of the uniform bill of lading, that would not go far enough to hold the defendant to pay the lawful rate. A uniform bill of lading for interstate shipments was established by the report of the interstate commerce commission in the matter of Bills of Lading, 14 I. C. C. Rep. 346, but it there was said at page 349 that this "bill of lading is designed for use in connection with the movement of miscellaneous freight and general merchandise and as a substitute

for the bills now in use in the carriage of this description of property. It is not intended to take the place of special bills of lading which are issued on particular commodities of such a nature or so handled as to require exceptional provisions, such as live stock, for example, and perhaps perishable property." The goods here in question were perishable. There is nothing in this record to show that the defendant knew or had reason to know that the uniform bill of lading was issued in this instance and that a special bill different in form as applicable to perishable goods might not have been used by the shipper and receiving carrier. The defendant told the plaintiff that it was receiving these goods not as owner but merely on commission, and that it would not accept them until the plaintiff informed it upon what terms it would release the goods to it. When those terms were stated, it accepted them. Its agreement was not a general one to pay the legal tariff, but a special agreement to pay only the amount demanded. *Central Railroad of New Jersey* v. *MacCartney*, 39 Vroom, 165. *Central of Georgia Railway* v. *Southern Ferro Concrete Co.* 193 Ala. 108. Its determination whether it would receive or decline the consignment, a determination which it had an unrestricted right to make either way without violating any duty to anybody, depended upon the amount demanded of it for charges. The defendant had no interest in the contract between the shipper and the carrier. For aught the defendant knew or was required to know, the acceptance from it of this payment by the carrier, if it should turn out to be partial, would not affect the carrier's right to collect the balance from the shipper, who was under the primary liability as shipper and owner. See *Georgia, Florida & Alabama Railway* v. *Blish Milling Co.* 241 U. S. 190, 197. The clause in the bill of lading was that the "owner or consignee" should pay the freight. But the defendant did not claim nor receive the goods under the bill of lading. The bill of lading issued to the shipper was not an "order" but a "straight" bill of lading and never came to the possession of the defendant and it did not know its terms. It is not necessary to consider what would be the rights and obligations of these parties if the bill of lading had contained the express stipulation that the consignee alone should pay the freight as a condition precedent to delivery to him.

As to the first car of cantaloupes, the plaintiff expressly states

in its argument and brief that it "does not base its claim on an implied agreement arising at common law, but on the interstate commerce act and the interstate bill of lading." We are of opinion, therefore, that under the circumstances here disclosed it cannot recover from the defendant on this item.

The facts are different as to the other five cars of cantaloupes in this particular: The defendant wrote to the freight traffic manager of the plaintiff, asking for the rates on cantaloupes under refrigeration from Payette, Idaho, to Boston, with references to the tariffs. A reply was made to this letter by the plaintiff's general freight agent,* giving the correct rates, with specific references to the published tariffs. It was found by the jury upon adequate facts that this letter of information was received by the defendant before it accepted any of the other five cars of cantaloupes. *Marston* v. *Bigelow,* 150 Mass. 45, 53, 54. The traffic manager and the general freight agent both were higher in authority than the freight agent at the Kneeland Street freight office and others there employed, who stated to the defendant the amount of the freight charges on the successive cars as they arrived. The plaintiff was obliged under the law to state accurately in writing the applicable rate in response to the defendant's request. Act of Congress approved June 18, 1910, c. 309, § 9, amending § 6 of the original act (U. S. St. 1887, c. 104). 36 U. S. Sts. at Large, 548. Hence, this statement being correct, the defendant was bound to know that it was authoritative. The defendant, therefore, had at hand the lawful freight rate on these cars. By simple computation it could have ascertained the lawful charges and by comparison it could have discovered that the charges set forth in the plaintiff's statement were too small. It was bound to know, also, that the only charge which the plaintiff lawfully could make was that established by the published tariff. Its inquiry as to the legal rate in this connection bears some indication that it expected to pay that rate if it took the goods. The writing of the letter of inquiry and the receipt of the reply with the correct information, in conjunction with the other circumstances, was a sufficient basis for the finding that the defendant, although agent and not the owner of the last

---

* This is the letter referred to in the first special question submitted to the jury printed on page 209.

five carloads of cantaloupes, knew and expected to pay the legal rates, and accepted them understanding that the plaintiff looked to it for the payment of the legal charges. In respect to these five cars, the principles stated and applied in *New York, New Haven, & Hartford Railroad* v. *York & Whitney Co.* 215 Mass. 36, are controlling. *Pennsylvania Railroad* v. *Titus*, 216 N. Y. 17. The defendant knew what the legal rate was from this definite and detailed statement by the general officer of the plaintiff. It had the references to the tariffs on file. It had asked for the charges orally of an employee of the plaintiff of inferior rank and had been given a different and lower figure. It knew that if the plaintiff released the goods, its lien was gone and it would be relegated to its rights against the shipper in a distant State, who had contracted with a different carrier. The inference is warranted from these facts that acceptance of the consignment constituted by implication an agreement to pay the lawful freight rate.

The facts that it had been customary heretofore, when an undercharge had been made and subsequently the mistake had been discovered and a bill for the undercharge sent by the plaintiff to the defendant, the latter had returned it with the statement that the account with the shipper had been closed and the defendant had no funds, were not decisive and were to be weighed with all the other evidence in determining the ultimate fact whether the defendant had agreed impliedly to pay the lawful rate. The same is true as to the fact that "Some time prior to September, 1911, the plaintiff sent to the defendant a request that the defendant execute with the plaintiff a contract, by the terms of which the plaintiff would agree that the defendant might be upon its weekly credit list, and, in consideration for this privilege, the defendant would agree with the plaintiff to pay the plaintiff all lawful charges for freight and other incidental expenses upon goods which might be consigned to the defendant at Boston, Mass., but the defendant expressly declined to sign such contract, and then informed the plaintiff that such contract would be disastrous to it since oftentimes it refused to accept consignments of highly perishable property sent to it at Boston, Mass., where the condition of the goods, the state of the market, and the responsibility of the shipper, or any of them, were not satisfactory to the defendant, and from that time to the present time the plaintiff has allowed the defendant

to accept goods without paying the charges in advance, but the plaintiff has on the same day rendered the defendant a bill for the charges, and the same has been immediately paid." This also was not conclusive, but was to be considered in determining whether by fair inference the defendant had agreed to pay the lawful rate on these particular cars.

The salient facts, in addition to those already stated, relating to the other group of charges, are these: One carload of pie plant and two carloads of peaches were shipped in interstate commerce to the defendant as a commission merchant, and it had no other interest in them except to sell the goods for the shippers and remit the proceeds after deducting its disbursements and commission. This fact was not communicated to the plaintiff. The defendant immediately paid to the plaintiff the amount of freight charges demanded of it, sold the goods, all of which were perishable, and remitted to the shipper the balance due after making the proper deductions, including the freight charges paid to the plaintiff. Later the plaintiff discovered that the charges collected of the defendant were too small and less than the lawful rate established under the interstate commerce act by reason of the unintentional omission of certain icing charges. It is sought now to recover the amount alleged to be the balance due by reason of those under-charges.

The defendant was at all these times a dealer in fruit and produce in Boston. A large part of its business was done as a commission merchant. But apparently its business was not exclusively of this character. Produce dealers throughout the country ship to the defendant and other produce dealers in Boston perishable fruit and produce for sale on commission at market prices. The defendant receives such shipments from persons entirely unknown to it. Perishable goods must be sold at once to avoid serious loss. It is "a custom of the trade among fruit and produce dealers at Boston, Mass., and especially commission merchants dealing in these goods, immediately to sell goods so consigned to them at the best market price and to remit the net amount received from such sales to the consignor, after deducting all known charges on said goods, and a successful conduct of the commission business especially requires immediate remittances." The bills of lading issued were "straight" and not "order," and were retained by the shippers and not sent

to the defendant. Whether the defendant impliedly agreed to pay the lawful rate established by law was in our opinion a question of fact to be determined by fair inference from the agreed facts. The defendant was the consignee of all these goods. That was some evidence that it was owner. *Rosenbush* v. *Bernheimer,* 211 Mass. 146, and cases collected at page 149. That being a general principle of commercial law, the relations of the parties may be presumed to have proceeded on the footing that each had a right to rely upon it and knew that the other had a like right. The defendant sometimes had notified the plaintiff that it was receiving goods on commission merely, but did not give such notice with respect to the three cars here in issue. The defendant knew also that an inexorable and immutable rate was established by law, which the carrier was bound to charge to somebody, and that it might incur serious liability for failure to collect. That factor alone may the more readily incline the mind to the belief that both parties were dealing with each other on the footing that the lawful rate was to be collected. The defendant further knew that by releasing the goods from its custody the carrier would lose its lien and would be remanded to its contract rights if it should turn out that there had been an undercharge. As was said by Chief Justice Holmes in *Spencer* v. *Spencer,* 181 Mass. 471, at page 473, "Of course it does not matter whether the defendant expected to pay . . . or not, the question is as to the natural import of his overt acts. *Bohn Manuf. Co.* v. *Sawyer,* 169 Mass. 477. *Hobbs* v. *Massasoit Whip Co.* 158 Mass. 194, 197. Again, it is not necessary that the defendant should have believed that the plaintiff expected pay. If as a reasonable man he should have understood from what he knew that such was the expectation, he would be bound."

The only essential difference between the claim for the balance above the undercharge on the first car of cantaloupes and those on these three cars, is that as to the former the defendant gave express notice to the carrier that it was not owner but simply commission merchant, while as to the latter it gave no notice but left the carrier to infer what it naturally might from the fact that it was consignee. But that difference appears to be enough to justify as matter of law a different conclusion. In *Pennsylvania Railroad* v. *Titus,* 216 N. Y. 17, it was said at page 21, respecting liability for freight rates upon a shipment in interstate commerce,

"As to the plaintiff, the defendant stood in the relation of owner of the peaches. The bills of lading designated him as the consignee and did not disclose his agency or the ownership of Franklin, nor did he notify the plaintiff before it delivered the peaches of either of such facts. At the time of the delivery the plaintiff did not have knowledge or notice, express or inferential, that the defendant was not the owner. Under those conditions, the plaintiff had the right, as a matter of law, to regard and deal with the consignee as the owner of the peaches, and the consignee in permitting the plaintiff to so deal with him agreed, through implication, that he would pay the plaintiff's lawful charges for transporting and delivering the peaches to him. The consignee was the presumptive owner and when he accepted the peaches and had not informed the plaintiff and the plaintiff did not have knowledge or notice before the delivery that he was a factor or agent and that his acceptance of them would be in that capacity, he by the acceptance obligated himself to pay the unpaid legal charges of transportation. . . . The obligation arose from the presumptive ownership, the acceptance of the goods and the services rendered and benefits conferred by the plaintiff for charges made and to be paid." A decision to the contrary upon this point is, *Central of Georgia Railway* v. *Southern Ferro Concrete Co.* 193 Ala. 108. The judgment in that case is rested chiefly upon *Central Railroad of New Jersey* v. *MacCartney*, 39 Vroom, 165, 173. No reference is made in the opinion in the latter case to the interstate commerce act, and the decision proceeds seemingly upon the footing that it was an intrastate shipment. It seems to us that a different inference under those circumstances might be required by law or at least be permissible by a jury.

The present record does not render the liability of the defendant a pure question of law. The deductions which ought to be drawn from all the facts, which were submitted, were for the jury. No exception has been alleged to the general instructions given. In view of all these conditions, we think the inferences drawn by the jury as shown by their answers, to the effect that the defendant impliedly agreed to pay the lawful charges, cannot be pronounced irrational. This branch of the case falls within the principles stated in *New York, New Haven, & Hartford Railroad* v. *York & Whitney Co.* 215 Mass. 36.

The facts which have been narrated dispose of the contention

that the plaintiff is estopped as matter of law to assert its claim to the balance unpaid by reason of the undercharges. They do not go to the length of warranting that ruling as matter of law. For the same reasons the defendant can have no recoupment.

No reversible error is disclosed by the manner in which the judge dealt with the several requests for instructions. The verdict was directed rightly upon the answers returned by the jury.

In accordance with the terms of the report, let the entry be

*Judgment for the plaintiff on the verdict.*

