**EMMONS COAL MINING CO. et al. v. NORFOLK & W. RY. CO.**

(Circuit Court of Appeals, Third Circuit. January 10, 1925.)

No. 3181.

**1. Carriers ⬅100(1)—Unloading coal of one shipper on order of another, as permitted by rules of exchange, held not release of first shipper from liability for demurrage.**

Tariff rule, affecting demurrage, that coal car should be deemed released when vessel registered for cargo or fuel supply, "except that, when cars are unloaded before vessel registers, such cars shall be released when unloaded," *held* not to relieve shipper of car dumped on order of another shipper of same grade of coal, as permitted by rules of coal exchange, from liability for demurrage, when substituted car was held subject to his order.

**2. Carriers ⬅100(1)—Coal shipper held not relieved from demurrage on car dumped on order of another shipper, under tariff rule relating to transfers of shipments.**

Unloading of coal of one shipper on order of another, as permitted by rules of coal exchange or pool, *held* not release of first shipper from liability for demurrage thereafter, under tariff rule that car should be considered as released on date shipment was transferred by "written order and acceptance" to another party, and that subsequent detention should be charged to such transferee.

**3. Carriers ⬅100(1)—Demurrage charges on shipments of coal held not invalid, as based on improper interpolation of tariff rules and rules of coal exchange.**

Demurrage charges against shipper of coal held in cars in yard of coal exchange until ordered out by the shipper *held* not invalid, as based on an illegal interpolation of tariff rules and rules of the exchange, though, as permitted by rules of exchange, coal was unloaded on order of another shipper of coal of same quality, and the cars released before ordered out by first shipper.

**4. Carriers ⬅70—Title to goods consigned to one person in care of another generally in consignee.**

Title to goods consigned to one person in care of another as general rule is in consignee.

**5. Carriers ⬅100(1)—Member of coal exchange pool held liable, rather than exchange, for demurrage charges on cars held by exchange.**

Shipper of coal to himself in care of coal exchange pool, who retained title to coal, or other coal of like quality in hands of the exchange, until ordered out, *held* liable, rather than exchange, for demurrage charges on cars so held, particularly in view of his assumption of such liability as a member of exchange.

**6. Carriers ⬅100(1)—That rule of coal exchange enabled railroad to charge demurrage on cars not actually detained held not to render tariff rule affecting demurrage unreasonable.**

That rule of coal exchange pool member was credited with coal shipped as soon as it passed particular point en route, and could then order withdrawal from exchange of equal amount, though his own coal would not be actually delivered to exchange for several days, enabled railroads to charge demurrage on cars not actually detained while cars of shipper were in transit, *held* not to render the tariff rule affecting demurrage unreasonable and invalid.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by the Norfolk & Western Railway Company against the Emmons Coal Mining Company and the Fidelity Casualty Company of New York. Judgment for plaintiff, and defendants bring error. Affirmed.

See, also, 287 F. 168.

Conlen, Acker, Manning & Brown, of Philadelphia, Pa. (J. T. Manning, Jr., of Philadelphia, Pa., on the brief), for plaintiff in error Emmons Coal Mining Co.

William G. Wright, of Philadelphia, Pa. (J. T. Manning, Jr., of Philadelphia, Pa., on the brief), for plaintiff in error Fidelity & Casualty Co.

J. Hamilton Cheston, F. M. Rivinus, and Theodore W. Reath, all of Philadelphia, Pa., for defendant in error.

Before BUFFINGTON, Circuit Judge, and BODINE and GIBSON, District Judges.

GIBSON, District Judge. In the court below the Norfolk & Western Railway Company brought its action against the Emmons Coal Mining Company and the Fidelity & Casualty Company of New York to recover an amount alleged to be due as

demurrage upon certain cars of coal shipped over the line of the plaintiff by the first-named defendant. The Fidelity & Casualty Company of New York was surety upon the bond of the Emmons Coal Mining Company, conditioned that the principal should pay all freight charges, demurrage, etc., due from it to the railway company.

The defendants each filed an affidavit of defense, raising questions of law, in effect a demurrer to plaintiff's statement. These defenses were overruled by the court below, with leave given to defendants to answer as to the facts. Thereupon defendants obtained a rule upon the plaintiff to show cause why the latter should not furnish certain information relative to the cars upon which demurrage was claimed. This rule was made absolute as to part of the information demanded, and discharged as to the other matters of which discovery was sought. Then defendants each filed an affidavit of defense, in effect the same, and plaintiff moved for judgment by reason of the alleged insufficiency of such affidavits. This motion was granted and judgment entered for the plaintiff.

The assignments of error in the instant case set forth the overruling of the defendants' affidavits of defense raising questions of law, the discharge, in part, of the rule to show cause, and the entry of judgment for want of sufficient affidavits of defense. The facts material to our present inquiry, as they appear from the pleadings, are substantially as follows:

The Emmons Coal Mining Company, in December, 1920, and January, February, and March, 1921, shipped a number of cars of coal over the lines of the Norfolk & Western Railway to Lambert's Point, Va., for transshipment in vessels. At the time these shipments were made a tariff of changes of demurrage on cars containing coal for transshipment at Norfolk and Lambert's Point, Va., duly filed and published, was in effect on the Norfolk & Western Railway. The parts of the tariff applicable to our present inquiry are the following:

"Rule 2.—Free Time Allowed.

"An average of five (5) days per car free time will be allowed, except on coke for export, on which an average of ten (10) days per car free time will be allowed.

"Rule 3.—Computing Time.

"(a) A notice of arrival must be sent or given to the consignee in writing or as otherwise agreed to by carrier and consignee upon arrival of cars and billing at Norfolk Terminals, Va.

"Time will be computed from the first 7 a. m. after the day on which notice of arrival is sent or given to the consignee.

\*　　\*　　\*　　\*　　\*　　\*

"(b) A car shall be considered as released:

"1. At the time vessel registers for the cargo or fuel supply of which the coal, coal briquets or coke dumped into such vessel is a part, except that when cars are unloaded before the vessel registers such cars shall be released when unloaded.

"2. To avoid delay that would be entailed in switching out and delivering on shipper's order, in actual sequence of arrival, cars containing the same grade of coal, as indicated by the identifying consigning names or numbers on the waybills, the dates on which cars should have been so released (as indicated by the record) will be substituted for the dates on which equivalent tonnage was actually delivered and the detention will be computed on the basis of such substituted dates.

"3. The dates shipments are transferred by written order and acceptance to another party shall be considered the date of release of the car for the account of the original consignee and subsequent detention shall be charged in the account of the new consignee without any free time allowance.

＿\*　　\*　　\*　　\*　　\*　　\*

"Rule 4.—Demurrage Charges.

"Settlement shall be made on the basis of detention to all cars released during the month. The date of arrival notice shall be subtracted from the date of release. From the total days detention to all cars thus obtained, deduct all Sundays and legal holidays following the date of arrival and five (5) days free time allowance for each car, except on cars containing coke for export deduct ten (10) days free time allowance for each car; the remainder, if any, will be the number of days to be charged at the rate of $2.00 per car per day. Excess credit days of any one month cannot be deducted from the excess debit days of another month."

At the time the aforementioned shipments of coal were made, the Emmons Coal Mining Company was a member of the Lambert's Point Coal Exchange, the object of which appears in the second of its articles of organization and rules, which follows:

"2. *Object.* The organization of the Lam-

bert's Point Coal Exchange is for the purpose of reducing coal classifications and necessary switching thereof, and to facilitate dumping, thereby expediting the despatch of vessels and augmenting car supply at the mines; and is to (a) act as an agency for the pooling of coal, and to execute to the Norfolk & Western Railway Company orders of the members for delivery of tonnage to vessels, permitting the use by a shipper of coal of the same pool to which the member has made shipments, and to the extent of such contributions, without being required to apply on the delivery order of a member the identical coal consigned to him; and (b) to maintain a complete record of all shipments of coal consigned by the members in the various classifications and of orders received from members and executed to the railway company covering delivery of coal to vessels."

The Lambert's Point Coal Exchange, with its rules, was recognized by the Norfolk & Western Railway Company, which appointed and paid its manager. Under the rules of the organization, each member shipped his coal to himself, care of the Lambert's Point Coal Exchange Pool. After the coal had passed Bluefield, W. Va., it was credited to the shipper, and thereafter coal to an equal amount could be delivered at any time to a vessel, provided his order was placed with the manager of the exchange. By the agreement of the members of the exchange, the manager was not required, in obeying the order of a member for the transshipment of his coal, to take such coal from cars shipped by that member and standing in the yards of the Norfolk & Western Railway at the point of transshipment, but was permitted to dump cars shipped by another member which contained coal of a quality equal to that ordered out. It will be remembered that rule 3 (b) 2 of the demurrage tariff, quoted supra, allowed a substitution of a car of a shipper of later arrival for one of earlier arrival at the point of transshipment, and by the agreement of the members of the exchange a further substitution of the car of one member for that of another was permitted.

Around this power of substitution centers the main controversy in the instant case. The railway company seeks to recover demurrage at the rate of $2 per day per car for the period between the arrival of the Emmons Coal Mining Company's cars and its order to the manager of the exchange to unload them, less the free time. The

coal company, pointing out that demurrage charges are collectible only upon detention of cars, urges that the railroad company is not entitled to the sum claimed in its statement, because that sum is demanded upon cars of the defendant actually unloaded, prior to the date to which demurrage is charged, to fill the order of another member of the coal exchange. It contends, although the coal of the substituting member may have been thereafter held in his car subject to the order of defendant, that the latter was absolved from subsequent demurrage when its own car was unloaded. It bases this contention, in the first place, upon its interpretation of the tariff, but further denies liability, in case its interpretation is held to be erroneous, on the allegation that the demurrage charge of the statement of claim can be sustained only by reading into the tariff the rules of the Lambert's Point Coal Exchange—an illegal interpolation, as the tariff must be complete in itself.

[1] In its interpretation of the tariff, defendant cites rule 3 (b) 1, supra, to sustain its contention that demurrage cannot be collected after the shipper's car has been unloaded pursuant to an order of another. That part of rule 3 provides that a car shall be considered as released at the time the vessel registers, "except that, when cars are unloaded before the vessel registers, such cars shall be released when unloaded." This interpretation of the rule is plainly not justified by an examination of the context. The exception in rule 3 (b) 1 is intended to cover the unloading of the coal into the vessel prior to the registry, not the dumping of the car of one shipper as the equivalent of that ordered to be unloaded by another. The vice of the defendant's interpretation is almost shown by its result, namely, that, where a car of one shipper has been dumped pursuant to the order of another, the cars of both shippers would be released, despite the fact that one would still remain in the railroad yards.

[2] The defendant's interpretation of paragraph 3 of rule 3 (b), supra, as affecting equivalent shipments on the part of members of the coal exchange, is also not justified. No transfers "by written order and acceptance," such as are contemplated by the rule, are under consideration in the present issue, and the section cannot be cited as authority for defendant's claim that it was released from the demurrage claimed in the present action.

As we read the tariff, we are satisfied

that it plainly contradicts defendant's contention that it absolves defendant from payment of demurrage upon cars unloaded in substitution of cars of another member of the coal exchange. Some clauses of it, each read by itself, may be lacking in clarity; but, read in conjunction with the entire context, they quite clearly sustain the interpretation of the plaintiff company.

[3] A study of the tariff has convinced us, also, of the lack of force in defendant's further contention that plaintiffs' claim is invalid because based upon the tariff *and* the rules of the Lambert's Point Coal Exchange, not upon the tariff alone. We quite agree with Judge Thompson, whose order is the subject-matter of the instant writ of error, when he points out in his opinion that, while certain substitutions of coal may have been made under the rules of the exchange, the demurrage charges were assessed entirely on authority and by virtue of the tariff. The substitution of cars of one member for those of another, a matter of bookkeeping, was by authority of the coal exchange agreement; but the charges sought to be recovered by plaintiff were assessed only under the tariff provisions, which provide for demurrage from the end of the free time until the coal was ordered out by the shipper. Such provisions have not been essentially affected by the fact that there was a substitution of cars among members of the exchange, when the situation thereafter between the shipper and the railroad is the same as before substitution, in that the former continued to have title to an amount of coal equal to that originally shipped by him, and the latter continued to have its cars detained, although not the identical cars, until the former ordered his coal unloaded.

[4, 5] The defendant below also seeks to avoid liability upon the demurrage claim of the plaintiff by a further contention to the effect that, under the facts disclosed by the pleadings, the Lambert's Point Coal Exchange was the actual consignee of the coal shipped, not the Emmons Coal Mining Company, and as such recovery of the demurrage charges must be from it, and not from the defendant. As stated, supra, the cars were consigned to the shipper himself, "care of the Lambert's Point Coal Exchange pool." Where goods are consigned to one person in care of another, by the general rule the title to the goods is in the consignee. It is true, exceptions to the rule may exist, but no facts appear in the present record to bring the shipments of the coal company within the scope of such exceptions. The coal company, as a member of the coal exchange, submitted itself to certain regulations and granted certain powers to the manager of the exchange, but never actually parted with its title to, or power of control over, the amount of the coal it shipped. It cannot consistently shift its demurrage burdens to the coal exchange, if for no other reason, because of its specific agreement as a member of that exchange. Rules 17 and 31 of the coal exchange are as follows:

"17. Members of the exchange, for whose account coal is shipped to the piers, shall be responsible to the Norfolk & Western Railway Company for demurrage charges accruing for their account, and for the freight charges (when waybilled collect), and vessel loading charges on coal unloaded into vessels for their account. Members shall file an agreement with the railway company as follows:

"'I (or we) hereby agree to pay freight charges (when waybilled collect), and vessel loading charges on coal unloaded into vessels for my (or our) account on orders executed by the manager of the Lambert's Point Coal Exchange, provided that bills for freight charges shall be so adjusted that they will not exceed the rates applicable on coal shipped to the piers for my (or our) account. The undersigned further agrees to pay any demurrage accruals under the tariff of the railway company, car days detention to be computed by subtracting the date of arrival of cars shipped for account of the undersigned from the date of release of equivalent cars.'"

"31. Car demurrage will be assessed by the railway company, on the average basis, for the account of individual shipper responsible. Detention will be computed by subtracting the date of arrival of cars shipped from date of release of equivalent cars. Credit car days of a member shipping in care of the Lambert's Point Coal Exchange, shall not offset debits of another member."

The pleadings make it quite plain, apart from the evidence of the rules quoted, that no change of ownership, upon shipment of the coal, actually took place, and, as a necessary sequence, that no change of liability for proper demurrage occurred.

[6] The defendants (below) have attacked the tariff upon which the claim of the railroad company is based, and the practice of the railroad company thereunder from still another angle. It will be re-

membered that the coal shipped by each member of the coal exchange was credited to him in the exchange when it passed Bluefield, W. Va., and after being so credited he was entitled to at once order the withdrawal of an equal amount of coal from the exchange, although his own coal would not actually be delivered at Lambert's Point for several days. This arrangement was made possible by the substitution clause of the coal exchange rules. The defendants have pointed out that this practice enabled the railroad company to charge demurrage although no actual detention of its equipment beyond the free time had actually occurred. It is true that, when a shipper exercised his right to order an equal amount of coal out of the pool as soon as his own coal had passed Bluefield, his order released cars in the Lambert's Point yard containing coal of another member of the exchange, and there was no actual detention of equipment while his own cars were in transit to Lambert's Point.

In setting forth this phase of their case, defendants have attacked the tariff as unreasonable. In considering the question of the reasonableness of the tariff, we must not overlook the fact that the above practice was one which inured to the benefit of members of the coal exchange as well as the railroad company, as it enabled them to avoid the expenses incident to delays of vessels awaiting arrival of the coal shipped, while it actually injured nobody, as demurrage was charged only from the date of arrival to the date the cars were ordered to be dumped, less the free time, as provided by tariff. The shipper who had cars standing in the yard was not injured because another was allowed to substitute those cars for his own cars in transit. If there had been no power of substitution, demurrage would have been charged against his cars in just the same way.

The Interstate Commerce Commission had the tariff under discussion in the instant case before it for consideration in the case of Smokeless Fuel Co. v. Norfolk & Western Railway Co., 85 Interst. Com. Com'n R. 395. The issues there involved were the same as those involved here. The Commission held the tariff and the practice of the railroad company thereunder to be reasonable and proper. We need not discuss the extent to which the decision of the Commission controls us, because we find ourselves in full accord with it.

The conclusion that no error existed in the judgment, in so far as the main issues were concerned, in effect disposes of that assignment of error relating to the refusal of the District Court to order the discovery of certain matters on the part of the railway company. The information sought was relevant and material only in case the coal company was correct in its contentions hereinbefore discussed, regarding the tariff and the application of it, and, those contentions failing, the second assignment of error falls with them.

The judgment is affirmed.