## Philadelphia Belt Line Railroad Company v. Holt Hauling & Warehouse Systems, Inc.

*Anthony B. Agnew, Jr.,* for plaintiff.

*Robert H. Malis,* for defendant.

BOLGER, J., May 24, 1972.—This matter was tried by the court, without a jury, on November 2 and 3, 1970, and a finding entered for defendant November 18, 1970. Plaintiff's exceptions to the finding of the court were briefed and argued to the court, and dismissed on July 28, 1971.

The action was brought by the Philadelphia Belt Line Railroad, a corporation engaged in the administration of local rail freight deliveries in the City of Philadelphia for the benefit of interstate carriers

such as the Reading Company and the Penn Central Railroad, against Holt Hauling and Warehouse Systems, Inc., a general public warehouse. Plaintiff complains that defendant ("warehouse") incurred demurrage obligations for detention of 18 flatcars consigned to its warehouse at Port Richmond. The facts are not in dispute.

Upon the arrival of a vessel carrying steel coils from Japan in the Port of Philadelphia, a local customs broker, John H. Faunce Co., Inc., an agent of the consignor, prepared a bill of lading directing the Reading Railroad ("Reading") to move the steel to defendant's public warehouse at Bristol and Bath Streets in Philadelphia for unloading and storage.

Plaintiff acknowledged that the bill of lading was prepared without the knowledge, joinder or signature of the warehouse company which was named "Consignee for purposes of notification only." The bill of lading also indicated that the shipment was "freight collect." All of these arrangements having been made between the railroad and the consignor in Japan, none of the documents in question were sent to defendant warehouse. Upon loading of the cars at dockside, the half cargo was shipped in nine cars, on or about August 2nd, not to the warehouse company, but to a marshalling yard in Port Richmond belonging to the Reading Railroad where the railroad retained possession of the freight cars. Upon arrival of the cars at the marshalling yard, an employe of both Reading and Belt Line, acting for both lines, called the warehouse, orally advised it of the arrival of the shipment and demanded payment of the freight from the pier to the warehouse as a condition precedent to the release of the cars for unloading. Warehouse orally advised him that it was not the owner of the goods, that they were the property of Luria Brothers, a

customer of warehouse, and furnished customer's full name and address to plaintiff in writing.

These nine cars were not released to Holt until the afternoon of August 4th, when the freight was paid, and not physically "spotted" on the Holt premises until August 5th at 1 p.m. Holt did not receive the benefit of the two days of free time normally allowed, but Belt Line charged demurrage for the ensuing six days, including Saturday and Sunday, until the cars were emptied.

Another nine carloads of steel arrived at the dockside on August 4th, under identical circumstances and were detained by plaintiff in the Reading yards until the freight bill was paid on August 15th, and finally "placed" on warehouse property on the 16th at 2 p.m. These cars were unloaded on the 17th, 18th and 19th.

Belt Line's tariff allowed the first two days as "free days," charged $7.50 per car for the next four days, and $15 per car for each day thereafter until the cars were unloaded, including all the time the cars were impounded for the collection of the freight bill. In five cases the car was physically placed on the 18th and released on the same day or the next day, but demurrage of $90 for each car was charged the warehouse, calculated from August 4th.

Plaintiff seeks damages for delay in unloading the cars—"demurrage"—from the warehouse for the period from their arrival at Port Richmond ("constructively placed") until their release empty, allowing two days "free time," irrespective of the fact that the cars were not made available to the warehouse for more than a day or two at the most. Defendant contends that it is not liable, since the delay was occasioned entirely by the desire of the Belt Line and Reading Railroads to retain a lien for freight

charges upon the goods until the same was paid to the railroad, and furthermore, since it is a public warehouse, it is not liable for demurrage charges in any event.

It is conceded that the warehouse had no general contract with either the Belt Line or Reading Railroad obligating itself to pay demurrage charges for its customers, nor was it privy to any of the bills of lading or other railroad documentation.

Upon oral demand for payment of its freight bill the railroad admitted that it received oral notification by the warehouse that the goods in question were the property of Luria Brothers, Inc., and further that it knew Holt to be a general public warehouse storing commodities for others.

Accordingly the court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Philadelphia Belt Line Railroad Company, acted as agent for the Reading Railroad in the movement of the freight from the dockside to the Holt warehouse property.

2. The cars were placed in the custody of the Reading Railroad in its storage yard at Port Richmond under its lien for freight charges until the freight was paid.

3. The Holt Warehouse Company had no contract with plaintiff, Philadelphia Belt Line Railroad, or its principal, the Reading Company, and was a notification consignee only.

4. Defendant warehouse company unloaded the cars promptly and with due dispatch and during the free time allowed it, once the cars were released to the warehouse company for unloading.

## DISCUSSION

Interstate Commerce Commission regulations control the problem at bar and the opinion of the commission in volume 318 of its reports, at page 593, is dispositive of the problem. In this report it is revealed that the commission had instituted an investigation on its own motion into the question of demurrage charges by motor vehicle carriers and undertook extensive hearings regarding publishing tariffs of the Middle Atlantic Conference, a tariff publishing agent for 1,300 motor carriers. The conference had proposed to include in its tariffs establishing demurrage charges, any public warehouse receiving goods by motor freight. The word "consignee" as used in its tariff meant, inter alia, a warehouseman, thus imposing liability upon the warehouse for freight and demurrage.

To this proposed tariff, protests and briefs were filed and the result of the commission hearings may be found on page 607 of the report which reads, in pertinent part, as follows:

"Notes B and C define consignor and consignee as parties from (to) whom the carrier receives (delivers) the shipment 'whether he be the original consignor (ultimate consignee), or warehouseman . . .' The situation appears to be the same with respect to carriers of other modes, and of pier operators as well as warehousemen engaged in a public service. Their status cannot be changed by publishing tariff provisions which purport to make them consignors-consignees for the purposes of assessing charges in connection with the transportation of a particular shipment."

On page 608 thereof, the commission followed the opinion in Smokeless Fuel Co. v. Norfolk & W. Ry.

Co., 85 I.C.C. 395, 401, in which it cited with approval the observation:

" 'The law seems to be well settled that the ¡party to whom a shipment is consigned is the legal consignee and not the party in whose care the goods are shipped.' We conclude that notes B and C of the proposed rule should be eliminated."

A 1969 decision of the commission is reported in 1969 Federal Carriers Cases (CCH) (335 I.C.C. 537), appearing on page 44,393, paragraph 36,350. In that report the commission dealt with the question of liability of a warehouse, agent, broker or steamship agency for the detention charges required by a given tariff provision. The commission decided (headnote in CCH):

". . . Where a tariff provision provides that the 'charges due the carrier under the provisions of this rule shall be paid either by the consignor or of the consignee, which ever causes the delay, irrespective of the responsibility for payment of freight or other charges' and where the terms 'consignor' and 'consignee' are defined in the tariff to include agents, brokers, steamship agencies and customs brokers acting in their behalf then such provisions are unlawful because they attempt to place liability for detention charges upon a person not a party to the contract of transportation. . . ."

The commission cited its prior decision regarding detention of motor vehicles, 15 Federal Carriers Cases (CCH), paragraph 35,539, 318 I.C.C. 593, which found unlawful tariff provisions similar to those under consideration in the above case defining the term "consignor" and "consignee" to include warehousemen and others not maintaining joint rates with the motor carriers because such parties are not parties of the contract of transportation. The com-

mission found that the beneficial owner or owners of the shipment would assume ultimate responsibility for the payment of detention charges not otherwise collected by the carrier from other parties voluntarily acting as agents for the principal. The commission affirmed and followed the decision of the Middle Atlantic and New England Case, supra, and concluded:

". . . such provisions are unlawful to the extent that they attempt to place liability for detention charges upon a person not a party to the contract of transportation."

Thus, the Interstate Commerce Commission (one commissioner only dissenting) held that a warehouse is not liable to a claim for transportation or for detention charges.

It is quite clear that defendant here, (a) neither a party to the contract of transportation, (b) nor a signer of any agreement with the railroad, is not liable for the basic freight detention charges: 13 C.J.S. 809, note 17; Southern Pacific Co. v. Granger's Business Association, 1 Pac. 2d 477, 115 Cal. App. 256.

Furthermore, the person liable for demurrage charges is the one through whose default or breach of duty the detention or delay in unloading occurred: 13 C.J.S. 808; Emmons Coal Mining Co. v. Norfolk & W. Ry. Co. (CCA 3d), 3 F. 2d 525, affirmed 47 Supreme Ct. Rep. 254, 272 U.S. 709, 71 L. Ed. 485; Baltimore & Ohio R.R. Co. v. L. B. Foster Co., 81 Pa. Superior Ct. 304.

In Southwestern Railway Co. v. Mays, 117 F. Supp. 182 (1959), the court defined demurrage in the following language:

" 'Demurrage' is a charge exacted by a carrier from a shipper or consignee on account of a failure on the latter's part to load or unload cars within the free time

prescribed by the applicable tariffs . . .The purpose of the charge is to expedite the loading and the unloading of cars, thus, facilitating the flow of commerce, which is in the public interest . . . The subject of demurrage is, in general, governed by the 'Uniform Demurrage Code,' which was adopted in 1909 by the National Convention of Railway Commissioners, and was approved by the Interstate Commerce Commission and ordered by that body to be put into effect throughout the country." (citing cases)

"In order for a liability for demurrage to exist, however, the failure to load or unload the cars within the free time must be the fault of the shipper or consignee; and, conversely demurrage cannot be charged where such failure was due to the fault of the carrier." (citing cases)

As is stated in the annotation, 46 A.L.R. at page 1156:

"No demurrage can be exacted by a carrier unless the delay in unloading is clearly attributable to the fault of the consignee."

The evidence adduced at trial made it abundantly clear that the railroad saw fit to move the freight in question as a part of "collect shipment" and further elected to assert its lien for the freight charges due the Reading Railroad. Thus, the delay was occasioned for the convenience and at the request of the Reading Company, not defendant.

Accordingly the court makes the following

## CONCLUSIONS OF LAW

1. Defendant Holt Hauling and Warehouse Systems, Inc., had no contract with plaintiff, Philadelphia Belt Line Railroad Company.

2. Holt Hauling and Warehouse Systems, Inc., was not the "consignee" within the meaning of the

Interstate Commerce Commission tariffs, but was a "notification consignee only."

3. The Holt Hauling and Warehouse Systems, Inc., being a general public warehouse, is not liable for demurrage charges of plaintiff railroad in the absence of an express contract to the contrary.

4. Plaintiff is legally responsible for the delay in unloading the cars and the same can not be assessed against the defendant.

For the foregoing reasons plaintiff's exceptions must be dismissed.