CONTINENTAL NAT. BANK OF LOS AN-
GELES v. TREMONT TRUST CO.

(Circuit Court of Appeals, First Circuit.
February 25, 1925.)

No. 1786.

Guaranty ⊗�➔43 — Bank guaranty of payment
of draft construed and held to require attach-
ment of order bill of lading.

A telegram sent by defendant bank to plain-
tiff bank, reading: "We will pay Golden Fruit
Co.'s draft bill of lading attached covering car
lemons ` shipment Fosgate Boston, * * *"
held to require attachment of order bill of lad-
ing for defendant's protection and attachment
by plaintiff, which purchased the draft of such
a bill of lading, indorsed in blank by the ship-
per, held a compliance with the terms of the
guaranty.

In Error to the District Court of the
United States for the District of Massachu-
setts; James Arnold Lowell, Judge.

Action at law by the Continental Nation-
al Bank of Los Angeles against the Tremont
Trust Company. Trial to the court. Judg-
ment for defendant, and plaintiff brings er-
ror. Judgment vacated, and judgment en-
tered for plaintiff.

Herbert U. Smith, of Boston, Mass.
(Hurlburt, Jones & Hall, of Boston, Mass.,
on the brief), for plaintiff in error.

Howard W. Brown, of Boston, Mass. (Ed-
ward G. Fischer, of Boston, Mass., on the
brief), for defendant in error.

Before BINGHAM, JOHNSON, and AN-
DERSON, Circuit Judges.

BINGHAM, Circuit Judge. The plaintiff
is a national bank, having its usual place of
business at Los Angeles, Cal. The defend-
ant is a trust company, organized under the
laws of Massachusetts, engaged in general
banking business at Boston. The Golden
Fruit Company, at the time of the transac-
tions here in question, were dealers in car-
load lots of fruit and produce at Los An-
geles, Cal., and the L. E. Fosgate Company
were wholesale dealers in fruit and vegeta-
bles at Boston, and were depositors in the
defendant bank. The action is brought to
recover damages for a breach of four sepa-
rate agreements to pay or to guarantee four
drafts, drawn by the Golden Fruit Company
of Los Angeles on the L. E. Fosgate Com-
pany of Boston, with bills of lading attach-
ed, covering four cars of lemons shipped by
the fruit company to Boston for the Fosgate
Company. The answer is a general denial.
The case was tried before the district judge,
without a jury, on an agreed statement of
facts, and the testimony of certain witness-
es.

Among the agreed facts it appeared that
on May 24, 1920, the defendant sent a tele-
gram, which the plaintiff received at Los An-
geles on the same day, reading as follows:
"We will pay Golden Fruit Co.'s draft bill
of lading attached covering car lemons ship-
ment Fosgate Boston, does not exceed 475
boxes at $3.25 per box"; that on May 27th
the defendant sent a second telegram to the
plaintiff, which was received that day, say-
ing: "We will pay Golden Fruit Company's
two drafts bill of lading attached covering
two cars of lemons, shipment Fosgate Bos-
ton, does not exceed 475 boxes each car at
$3.25 per box"; that on June 3, 1920, the
defendant sent a third telegram, which was
received by the plaintiff at Los Angeles on
that day, reading the same as the second
telegram, and covering two additional cars;
that on June 9, 1920, the Atchison, Topeka
& Santa Fé Railroad Coast Line, a common
carrier of freight, accepted for transporta-
tion at Corona, Cal., a car loaded with 406
boxes of lemons, and on that day issued a
bill of lading to the order of Golden Fruit
Company, Boston, Mass., and having thereon
the words "Notify L. E. Fosgate & Co. at
Boston"; that the Golden Fruit Company
indorsed the bill of lading in blank and at-
tached it to a draft dated June 9, 1920,
which it drew on Fosgate & Co. for $1,217.-
50, payable at sight to the order of the Con-
tinental National Bank; that on June 12th
the same carrier accepted for transportation
at Corona a car loaded with 406 boxes of
lemons, and issued a similar bill of lading,
which the Golden Fruit Company indorsed
in blank and attached to a draft dated June
12, 1920, drawn on Fosgate & Co. for $1,-
292, payable at sight to the order of the Con-
tinental National Bank; that on June 11,
1920, the same carrier accepted for trans-
portation at Ormond, Cal., a car loaded with
406 boxes of lemons, and on June 12 issued
a like negotiable bill of lading that the Gold-
en Fruit Company indorsed in blank and at-
tached to a draft dated June 12, 1920, which
it drew on Fosgate & Co. for $1,319.50, pay-
able at sight to the order of the Continental
National Bank; that on June 16, 1920, the
same carrier accepted for transportation at
Corona a car loaded with 392 boxes of lem-
ons, and on June 17, 1920, issued a similar
bill of lading, which the Golden Fruit Com-
pany indorsed in blank and attached to a
draft dated June 17, 1920, which it drew
on Fosgate & Co. for $1,323, payable at
sight to the order of the Continental Nation-

al Bank;. that the Continental National Bank, relying on the promises of the Tremont Trust Company contained in its telegrams of the 24th and 27th days of May and the 3d of June, purchased from the Golden Fruit Company the four drafts, with the bills of lading attached, of June 9th, 13th, and 17th, paying therefor the amounts which the drafts called for; that, as each draft was purchased, the Continental Bank indorsed it as follows: "Pay to the order of any bank or trust company for collection only. Continental National Bank, Los Angeles, Cal.," and forwarded them, with the bills of lading attached, to the Tremont .Trust Company for payment; that the trust company received the drafts and bills of lading in due course; that the car of lemons covered .by the first bill of lading arrived in Boston June 25, 1920; that the car covered by the second arrived June 26, 1920; and the car covered by the fourth July 2, 1920; that the Fosgate Company was notified by the freight agent of the Boston & Maine Railroad of the arrival of each of the four cars as soon as they reached Boston, and. refused to accept delivery; that the lemons were sold by the railroad, and the proceeds of the sale appropriated to pay the freight charges; that each shipment did not exceed 475 boxes; that the price per box did not exceed $3.25; and that each draft did not exceed 475 boxes at $3.25 per box, the amounts stated in the telegrams of the 24th and 27th of May and the 3d of June, 1920; that on June 18, 1920, which was two days after' the fourth car had been accepted for transportation, and one day after the fourth draft, with bill of lading attached, had been forwarded for payment, the Tremont Trust Company telegraphed the Continental National Bank as follows: "Cancel our telegram of guarantee on draft Fosgate & Co. Boston by Golden Fruit Co. not used on receipt of this telegram, bill of lading not in accordance under our guarantee"; that on June 19th the trust company sent another telegram. to the Continental Bank, saying: "Golden Fruit Co. draft not in accordance with Fosgate guarantee on account of .cars not shipped direct to Fosgate. They refuse payment on these grounds"; that on July 8, 1920, the Tremont Trust Company returned the first three drafts to the Continental Bank, stating that payment was refused for the reason above given; that on July 28, 1920, the fourth draft was delivered to the attorneys for the Continental Bank; that on August 12, 1920, a notary public presented the four drafts, with bills of lading attached, to the Fosgate Company, and demanded payment, which was refused;

that on that day the notary protested the drafts for nonpayment and notified the drawer, the indorsee, and all other persons concerned therein; that on or about August 12, 1920, said attorneys presented the drafts, with bills of lading attached, to the defendant and demanded payment, which was refused; that the Continental Bank was not a party to, and had no knowledge of, any correspondence between, statements made by, or the business relationship of, the Golden Fruit Company, L. E. Fosgate Company, Tremont Trust Company, or any other person or persons interested in such shipments of lemons, except the telegrams and letters which have been heretofore referred to; that it purchased the drafts in the course of its business on the strength of the promises contained in the telegrams from the trust company, and thereafter, in the regular course of business, transmitted the drafts, with the bills of lading, for payment; and that said drafts have not been paid, either in part or in full.

One Heintz, an officer of the L. E. Fosgate Company, was called as a witness by the defendant, and testified that he had been in the wholesale fruit business for 19 years; that he had had occasion to use bank guarantees for the shipment of fruit from distant points; that he was familiar with guarantees worded in substance as this guarantee, and, subject to plaintiff's exception, testified that the words "Shipment Fosgate, Boston" was known in the trade to have a special significance, and meant "that the goods are to be shipped to Fosgate, Boston; direct to Fosgate, so that Fosgate will have jurisdiction over them from the time they are shipped"; that to obtain possession of a shipment on an order bill of lading one had to present to the railroad the order bill properly indorsed; that the railroad would deliver the goods consigned on a straight bill of lading without presentation of the bill of lading; and that a purchaser can divert on a straight bill of lading without payment of the draft attached, but could not divert or control the shipment on an order bill. of lading until the draft is paid.

Lane, a witness for the defendant, subject to the plaintiff's exception, testified that he was familiar with guarantees worded like the one in question, and that the words "shipment Fosgate" meant that the shipment is to be to Fosgate; that there was a custom with reference to such a shipment as to the kind of a bill of lading to issue, to wit, a straight bill of lading; that on a straight bill of lading the car would be subject to Fosgate & Co.'s control all the time, while

on an order bill it would not be under Fosgate & Co.'s control until they obtained possession of the bill of lading. On cross-examination, however, he testified that, where a person is a consignee in an order bill of lading, it was a shipment to that person; and, while that person could not control or divert the car until he obtained possession of the bill of lading, he could thereafter.

One Liddell, a witness for the plaintiff, manager of the foreign department of the Fourth Atlantic Bank, who had had a banking experience of over 30 years, testified that there was no custom among bankers in Boston, when the shipment is perishable goods, that the bill of lading should be a straight bill rather than an order bill; and, on being inquired of whether there was any custom which would affect the meaning of the words "shipment Fosgate," said those words would not mean anything to him further than to identify the shipment that it was a shipment intended for Fosgate; that diversion orders were matters arranged by the shipper; and that the shipper arranged to divert a shipment according to instructions.

Thorne, a witness for the plaintiff, testified that he was familiar with drafts and bills of lading, and that there was no custom among bankers in Boston that when the words "draft bill of lading attached" are used that they mean a straight bill must be attached.

The district judge, after stating that the defendant's contention was "that the bill of lading should have been what is defined in the Pomerene Act as 'a straight bill of lading,' namely, one 'in which it is stated that the goods are consigned or destined to a specified person,'" in construing the terms of the telegram, said:

"A bill of lading made out to order, known as an 'order bill,' is used as security for the payment of the attached draft. There seems no reason for guaranteeing the draft for a shipment if a bill of lading was made out to order, as it would be security for the draft. It seems to me, therefore, that the form of the telegram should have given notice to the plaintiff that the shipment was to be on a straight bill of lading. The telegram should have been understood by the plaintiff to relate only to a shipment to Fosgate direct."

He then states that, in reaching the above conclusion, he has not taken into consideration "the evidence introduced at the trial as to a custom that the words 'shipment Fosgate, Boston' meant that the bill of lading was to be a straight bill to Fosgate"; but had "considered the fact, which also appeared in evidence, that when a straight bill is used the consignee may order the goods to be stopped at some intervening point." He denied the plaintiff's requests for rulings so far as they were inconsistent with the ruling he had made, and the plaintiff excepted to the refusal to grant each of its requests. A judgment having been entered for the defendant, the plaintiff brings this writ of error, and in its assignments of error complains that the court erred in refusing its requests and in the admission of the testimony above referred to, to which it excepted.

We do not find it necessary to consider the exceptions to evidence, for no custom was found to exist, and the district judge expressly stated that, in reaching the conclusion that he did in the construction of the telegram, he did not take into consideration the evidence of a custom that the words "shipment Fosgate, Boston," meant a straight bill to Fosgate.

The plaintiff complains because the district judge, in construing the telegram, took into consideration that a consignee in a straight bill of lading may, after the goods are in the hands of the carrier, order them, during transportation, diverted to some other point than that designated in the bill of lading, or stop them at some intervening point. This right of a consignee under a straight bill is nothing more than a conclusion which follows from the provisions of the Pomerene Act (Comp. St. §§ 8604aaa–8604w) as to the rights of a consignee under such a bill. But, whether the conclusion is one of fact or law, it lends no aid in determining that the language used by the defendant bank in this guarantee called for a straight bill of lading. It simply shows what the purchaser's or consignee's rights would have been in case the guarantee called for such a bill. See 39 Stat. L. c. 415, §§ 9, 10, 11 (Comp. St. §§ 8604c, 8604ee, 8604f); 1 Williston on Sales, § 285, pp. 647–650.

Section 9 provides that a carrier is justified in delivering the goods on a straight bill to the consignee named in the bill, with a proviso, however, that he shall not be justified in doing so if he has been requested by one having a right of property or possession in the goods not to do so. Section 10 (a). And it would seem to follow that the right of the consignee in a straight bill to divert or stop goods en route must be subject to the qualification that he does not possess this right where the carrier has been requested by the person having the right of property not to permit it.

The real and only question in this case is the proper construction of the telegram. The telegram states the contract, and, in construing it, it should be borne in mind that the parties to the contract are the Continental Bank and the Tremont Trust Company, and not the Golden Fruit Company or Fosgate & Company; that the language of the contract is that of the trust company's own selection; and that the plaintiff should not be subjected to the burden of giving it a meaning other than what its terms fairly import, or be charged with notice that they mean something different, when, if they were intended to mean something different, it was entirely within the power of the defendant to disclose that intent in the language it employed. Lawrence v. McCalmont, 2 How. 426, 449, 450, 11 L. Ed. 326.

The district judge based his ruling that the terms of the telegram were or should have given notice to the plaintiff that the shipment was to be on a straight bill of lading on the premise that there was no reason for guaranteeing the draft if the bill of lading was made out to order, as the bill of lading would be security for the draft, thereby meaning, as applied to the facts in this case, that, as the plaintiff bank had received the guarantee of the defendant bank, there was no occasion for the plaintiff bank to take a draft with an order bill of lading attached for its own protection; and, there being no occasion for the plaintiff to take an order bill of lading for its own protection, he ruled that the form of the telegram was, or should have been, notice to the plaintiff that the shipment was to be on a straight bill.

The difficulty with the conclusion or ruling is in the premise. The premise does not cover the situation presented by the facts in the case. The fact is that the telegram containing the guarantee which the defendant sent to the plaintiff required the plaintiff, in order to meet the terms of the defendant's guarantee, to attach to the draft a bill of lading for the defendant's protection. The plaintiff had a right to understand from this requirement of the defendant that it was demanding that the bill of lading attached to the draft should be in such form as would give the defendant security; and it knew that, to give such security, the bill of lading that was to be attached should be an order bill, one either to the order of Fosgate & Co., or in the form adopted in this case, and indorsed in blank, for a bill of lading in either of these forms would give the required security to the defendant,

to whom the draft and bill of lading were sent, in that the carrier could not justify a delivery, and would not deliver, to Fosgate & Co., unless Fosgate & Co. obtained possession of the bill and presented it to the carrier. In other words, the defendant by using the words "draft bill of lading attached" required the plaintiff bank to attach an order bill if it would comply with the terms of the contract, unless there is other language in the contract that necessarily called for a straight bill. This is the construction placed by the Supreme Court of Canada upon these words when used under similar circumstances. Pioneer Bank v. Canadian Bank of Commerce, 53 Can. S. C. 570, 13 A. L. R. (annotated) 160, decided June 24, 1916.

In that case the court had under consideration the construction and meaning of a telegram sent by the Bank of Commerce in Canada to the Pioneer Bank in California, in which it said:

"We guarantee payment of drafts on J. J. McCabe with bills lading attached not exceeding in all sixteen hundred and twenty nine $^{70}/_{100}$ dollars covering two cars oranges containing 396 boxes each in P. F. E. 8304 and P. F. E. 11,914."

There, as here, the California Bank purchased the drafts with bills of lading attached, and the Canadian Bank refused to honor the drafts on the ground that the attached bills did not comply with the guarantee as stated in defendant's telegram, in that the bill of lading issued by the carrier ran direct to the shipper. It bore the words "Notify J. J. M.," who was the purchaser, and also had upon it a direction to "deliver without bill of lading on written order of shippers." It was held that the bill of lading was not in a form to protect the defendant bank; that it left the goods in the entire control of the shippers, thus depriving the guarantor of the security of the goods. It was there said:

"It seems * * * clear that both banks quite understood that such protection [the protection a bill of lading of such character that when in the hands of the Bank of Commerce no one else could obtain possession of the goods without the bill] should be afforded by the bill of lading, and that anything, even though called a bill of lading, which did not afford that protection to the Bank of Commerce would cause 'such failure of consideration as cannot have been within the contemplation of either side.'"

It is evident that, since the adoption of the Pomerene Act regulating bills of lading

as to interstate shipments, if the Tremont Trust Company's letter called for security, the security to which it was entitled was an order bill of lading,—one drawn to the order of the shipper and indorsed in blank, or one drawn to the order of the purchaser, for a straight bill to the purchaser would not afford such security.

But the defendant contends that the words "shipment Fosgate" which also appear in the telegram are controlling, and call for a bill of lading running direct to Fosgate—a straight bill. It is to be noted that the telegram does not say "shipment to Fosgate," or "shipment for Fosgate" or "intended for Fosgate." It must be conceded, however, that the words "shipment Fosgate," to say the least, mean a shipment for Fosgate or intended for Fosgate, and, so construed, would be consistent with the language employed calling for an order bill giving security to the defendant bank; whereas, if these words be construed as calling for a straight bill, such meaning would be inconsistent with the language requiring security. The language of the telegram is to be construed as a whole, and, when so construed, does not call for a direct bill, but for an order bill.

It is further argued by the defendant that a bill of lading drawn to the order of the shipper, and indorsed in blank, differs from a bill to the order of the purchaser in the protection afforded the defendant, as section 24 of the Pomerene Act (Comp. St. § 8604*ll*) subjects an order bill of lading to equitable attachment by the creditors of the owner. We fail to appreciate the force of this argument. It is conceded that, if a bill is issued to the order of the purchaser, he is the legal owner, and, if it is issued to the order of the shipper, the shipper is the legal owner. But, while the purchaser in one case and the shipper in the other may have the legal title, the attachable interest of either, after the drafts with the respective bills attached are sold, would amount to nothing. The defendant's guarantee did not become operative as to any particular draft until that draft with bill attached was purchased by the plaintiff, and from then on the shipper, the Golden Fruit Company, had no attachable interest, and the Fosgate Company would acquire none until it paid the draft.

We think the court below erred in its construction of the telegram; that its true construction called for an order bill of lading, and, as the admitted facts showed a compliance with the contract of guarantee, a verdict and judgment should have been entered for the plaintiff.

The judgment of the District Court is vacated; the verdict is set aside; a verdict and judgment is entered for the plaintiff in error, with costs in this court and the court below.

ANDERSON, Circuit Judge, concurs in the result.