---

## In re TAUB.

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 298.

1. **Bankruptcy ⏥440—Availability to party of remedy of either appeal or petition to revise precludes party from resorting to both remedies.**

Appeal and petition to revise, are mutually exclusive remedies, and where a party can avail himself of one the other is not open to him.

2. **Bankruptcy ⏥440—Controversy over distribution of funds reviewable by appeal, not by petition to revise; "controversy arising in bankruptcy proceeding."**

A controversy over disposition of funds in hands of trustee is a "controversy arising in bankruptcy proceeding," and reviewable in Circuit Court of Appeals by appeal, under Bankruptcy Act, § 25 (Comp. St. § 9609), but not by petition to revise, under section 24b (Comp. St. § 9608).

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Controversy Arising in Bankruptcy Proceedings.]

3. **Bankruptcy ⏥467 — On appeal, Circuit Court of Appeals may examine record to find facts it discloses.**

On appeal from order determining controversy in bankruptcy proceeding, Circuit Court of Appeals may examine record to find facts it discloses.

4. **Carriers ⏥93—Carrier, delivering to consignee in straight bill, after receipt of instructions from one having right of property or possession not to deliver to such consignee, is liable to person so instructing.**

Carrier, delivering to consignee in straight bill, after receipt of instructions from one having right of property or possession not to deliver to such consignee, is liable to person so instructing, in view of Act Aug. 29, 1916, § 10, known as the Pomerene Act (Comp. St. § 8604ee).

5. **Carriers ⏥86 — Carrier, depositing shipment with storage company pursuant to instructions from one claiming right to shipment, required to notify storage company to deliver to lawful consignee.**

A carrier, which deposited a shipment of fruit with a storage company as against consignee named in straight bill, pursuant to instructions received from one claiming the right to the shipment, was required, after the fruit had been inspected and checked, and shipping documents examined and freight paid, to advise the storage company to deliver the fruit to the lawful consignee.

6. **Warehousemen ⏥30 — Storage company held not entitled to lien against shipment for charges due from consignee in respect of prior merchandise stored.**

General lien in favor of storage company against consignee in straight bill of lading for charges due from consignee in respect of prior merchandise stored by him could not be asserted under Warehouseman's Act N. J. § 28, against shipment which was diverted and stored in warehouse by carrier pursuant to instructions from one entitled to possession of shipment; original consignee having no such interest as would support pledge of goods.

7. **Carriers ⏥82—Under Pomerene Act, transferor of straight bill or transferee had right to notify carrier not to make delivery to consignee named in straight bill.**

Under Pomerene Act, § 32 (Comp. St. § 8604pp), transferor of straight bill of lading or transferee thereof *held* to have right to notify carrier not to make delivery to consignee named in straight bill.

Petition to Revise Order and Appeal from the District Court of the United States of the Southern District of New York.

In the matter of Louis Taub, bankrupt. The District Court affirmed an order of the referee directing the Central Union Trust Company of New York, as a depositary of funds, to pay a certain amount thereof to the Union Terminal Cold Storage Company of New Jersey, and the Yakima Trust Company brings a petition to revise such order, and also appeals. Petition to revise dismissed. Order appealed from reversed, with directions.

See, also, 4 F.(2d) 993.

This cause comes here from the United States District Court for the Southern District of New York on a petition to revise and on appeal. The bankrupt, Taub, was a wholesale fruit dealer, engaged in business in the city of New York. For some time before his bankruptcy he was buying fruit with a party by the name of Small in Yakima, in the state of Washington, at which place, as its name indicates, the Yakima Trust Company was engaged in conducting a banking business.

The general method which Taub and Small followed was that Small would buy fruit in his vicinity in carload lots and ship each lot under a straight bill of lading, which named Taub as consignee. He would then draw a draft on Taub for the price of the fruit in each lot, discount the draft with the

trust company giving the bill of lading as collateral, and with the money thus obtained would pay for the fruit which he shipped. Taub, on receipt of the fruit in New York, would sell it, and he and Small would share their proportion of the profits or losses which resulted.

In October, 1922, Small bought in Washington 42 carload lots of fruit, which he shipped to Taub, taking a straight bill of lading, which named Taub as consignee and New York as the place of destination. On the arrival of the shipment at its destination, direction was given to the Union Terminal Cold Storage Company of New Jersey, the respondent appellee, hereinafter called the storage company, to take possession of the fruit and place it in its storage warehouse. Thereafter the Yakima Trust Company, hereinafter called the trust company, through its agent notified the storage company that it made claim to all of said fruit so consigned to Taub, and demanded that the property be held in its name.

Small, Taub, and the trust company had an agreement that Small should draw drafts upon Taub for the exact amount of the purchase price he (Small) was to pay to the persons from whom he bought the fruit to be shipped, and that he would notify Taub of the amount to be paid; that Taub should then notify the trust company by telegraph guaranteeing the payment of each draft so drawn; that the trust company, upon receipt of the guaranty of Taub, discounted the draft and paid the proceeds to Small; that Small at the same time delivered to the trust company the bills of lading for each carload lot of fruit, together with the draft drawn by Small on Taub.

The draft and bill of lading attached were forwarded by the trust company to the Irving National Bank, its banking agent in New York, with instructions to deliver each bill of lading to Taub on the payment of the draft attached. It was agreed between Small and Taub that the latter should not be entitled to the possession of any carload of fruit until Taub had paid to the agent of the trust company the draft attached to the bill of lading for that car. It was understood and agreed between Small and Taub that the latter was to use his own judgment as to the time to dispose of the fruit so consigned to him, and that the profits and losses would be divided equally between them. It was also understood and agreed that Taub would not sell or take possession of the fruit until he had made payment of the drafts drawn on him therefor, and if drafts were not paid on presentation to him the trust company should be entitled to take possession of each and every carload on which it had made advances which remained unpaid, and could sell the fruit in the markets and apply the proceeds realized therefrom to the payment of the outstanding drafts.

On October 19, 1922, the trust company was notified that Taub had failed to pay drafts drawn upon him by Small, and thereupon it requested Small to divert to the trust company the cars then en route. Thereupon Small instructed, in writing, the railroad company to divert the 42 carloads of fruit, and they were diverted to the trust company and on arrival at their destination the said 42 carloads of fruit were placed in the warehouse of the storage company and were held by it in the name of the trust company, to which it issued its warehouse receipts therefor. Thereupon an agreement was entered into between the trustee in bankruptcy of Taub, the trust company, and the storage company, and the contents of the 42 carloads of fruit were disposed of at public auction. The gross amount realized at the sale was $57,492.50. After deducting the payment of charges to the storage company, the selling commissions, and other charges, the net proceeds from the sale amounted to $21,623.

The storage company claimed that there remained due to it an additional charge of $3,782.28; the trustee in bankruptcy claimed he was entitled to receive $17,840.72, which was the net proceeds of the auction sale, less the storage company's unpaid charge; and the trust company claimed there was due to it for its advances $31,532.75, with interest, its claim being in excess of the $21,623 realized at the public auction, and which was on deposit with the Central Union Trust Company of New York, subject to the orders of the court.

The District Court, on February 24, 1924, entered an order which confirmed an order made by the referee in bankruptcy, directing the payment of the claim of the storage company in the sum of $3,782.28, with interest. The order also denied a motion to reverse the referee's order directing the payment of the sum of $17,840.72 and interest to the trust company. This order of the District Court was brought to this court on petition to revise, and this court affirmed the action of the court below in an opinion filed on December 2, 1924. 4 F.(2d) 993.

The present controversy grows out of the transactions which have been set forth, but

it presents a question different from that which was decided in the opinion of December 2, 1924. The question now presented arises between the trust company and the storage company, and these two companies are the only parties in interest herein.

Beekman, Bogue, Clark & Griscom, of New York City (William Campbell Armstrong, of New York City, of counsel), for petitioner appellant.

Dallas Flannagan, of New York City (John W. Davis, of New York City, of counsel), for respondent appellee.

Before ROGERS, HOUGH, and HAND, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1, 2] The parties to this proceeding have seen fit to bring it into this court by a petition to revise and by an appeal. There are certain proceedings in bankruptcy which can be reviewed by writ of error. There are others which are to be reviewed by an appeal. There are others which are to be reviewed by petition to revise. In general it may be said that the character of the proceedings determines the proper method to be pursued in bringing the proceedings into this court. Section 24a of the Bankruptcy Act (Comp. St. § 9608) gives the Circuit Courts of Appeals "appellate jurisdiction of controversies arising in bankruptcy proceedings." Section 24b gives them "jurisdiction in equity * * * to revise in matter of law." The Supreme Court, in Re Loving, 224 U. S. 183, 32 S. Ct. 446, 56 L. Ed. 725, declared that the proceeding under section 24b was not intended as a substitute for the right of appeal under section 25 (Comp. St. § 9609). The two remedies, appeals and petitions to revise, as we have many times said, are mutually exclusive, and where a party can avail himself of one the other is not open to him. In Globe Bank & Trust Co. v. Martin, 236 U. S. 288, 295, 35 S. Ct. 377, 59 L. Ed. 583, it was held that a controversy over the distribution of a fund in the hands of a trustee in bankruptcy is "a controversy arising in the bankruptcy proceedings, and hence appealable as other cases in equity under the Circuit Court of Appeals Act," and that the appeal to the Circuit Court of Appeals was properly taken. And see the cases cited in Remington on Bankruptcy (3d Ed.) vol. 8, p. 76, § 3688. The petition to revise is dismissed, and we shall dispose of the case on the appeal.

The case is here on appeal from an order made in the District Court dated February 29, 1924, which directed the Central Union Trust Company of New York City to pay to the storage company the sum of $3,782.28. Under the decision on the first appeal the trust company would have been entitled to receive the sum of $21,623, the full amount realized at the auction sale of the fruit after payment of the charges of the storage company in the sum of $33,021.13, if it had then been ascertained that the storage company's remaining charge of $3,782.28 did not constitute a lien on the proceeds of the sale of the fruit. Whether this second claim of the storage company amounts to a lien on the particular proceeds now before the court is to be determined herein.

The conclusion reached in the first appeal, and which gave the trust company a lien after discharging the lien of the storage company, was reached upon the theory that, while the legal title to the fruit was in Taub under the straight bill of lading, the fruit equitably was the joint property of Taub and Small, who were partners in the joint adventure, and that Small had power to borrow for the joint enterprise, and when he drew his drafts on Taub and discounted them with the trust company, transferring to it the straight bills of lading, he gave to that company the same equitable right in the fruit that he himself possessed; and when the fruit was sold the trust company's equitable lien in succession to Small attached to what remained after paying the lien of the storage company. The trustee of the bankrupt had no interest in the estate, for his interest extended only to any surplus which remained after the payment of the trust company's lien, and after its payment there would be no surplus.

The question now raised has not been decided. It is whether the storage company's claim to the $3,782.28 has been now established. Unless this has been done, that amount also must be paid to the trust company in addition to the $17,840.72. The fact being that the trust company's just claim for its advances amounted to $31,532.75, and under the decision on the first appeal it would have been entitled to the whole of the balance, $21,623, deposited with the Central Union Trust Company, but for the fact that the storage company had asserted an additional warehouseman's lien under the laws of New Jersey against the fund to the extent of $3,782.28.

The storage company is here claiming that it now has established its right to this ad-

ditional lien in the above amount. As to this claim the referee has found, as follows: "The claim or lien asserted by the storage company is for storage charges due from Taub in respect of prior merchandise stored by him in his name, other than the merchandise represented by the 42 carloads; the storage company pleading that its claim or lien outranks any claim or lien of the Yakima Company [the trust company] to the extent of $3,782.28 to or upon such $21,-623."

He has sustained the validity of the lien as against that of the trust company in the following statement: "As to the claims of the storage company: All claims for storage on the contents of the 42 cars have already been paid out of the proceeds of sale, with the consent of all parties. The claim by the storage company to be reimbursed for other storage due from Taub on other merchandise, viz. $3,782.28 before the lien of the bank is satisfied, seems to me well founded on the doctrine of estoppel. By the bank's act in leaving the contents of the 42 cars in the possession and control of Taub (by accepting the pledge of a 'straight' bill of lading), the bank took the risk of any act of Taub subjecting the fruit to his own liens. De facto he stored the fruit in his own name, entirely or to a large extent. Having done so, he subjected the fruit to any lien which the storage company might have against him as fully as if he had been the owner of the fruit free and clear of any claim by the bank."

He thereupon directed the Central Union Trust Company, the depositary, to pay to the storage company $3,782.28. And this decision the court below affirmed. It appears to have been assumed by the referee that Taub had possession of the fruit, and deposited it with the storage company in his own name, and that the storage company had a claim against him for storage charges in respect of prior merchandise stored in his name, and that when the fruit in the 42 carloads was deposited the storage company had no notice of the claim of the trust company. If such were the facts, as established by the record, we could understand the claim which the storage company puts forward and the decision of the court below sustaining it. But we do not so understand the facts.

[3, 4] As this case is here on appeal, we have a right to examine the record and find the facts which it discloses. It discloses that the fruit deposited in the storage warehouse was not deposited therein by the orders of Taub, but by the railroad company, under instructions given to it by Small while the fruit was en route. The "deposit" could not have been made by Taub, for he at no time had possession. Not only did Taub at no time have possession, but at no time after the receipt of the diversion orders could the railroad company legally have delivered possession to Taub. See section 10 of the Act of August 29, 1916, 39 St. pt. I. c. 415, p. 540, known as the Pomerene Act (Comp. St. § 8604ee). That act relates to shipments in interstate commerce. The act makes the carrier liable unless it delivers to the consignee named in a straight bill, and even then is liable, if prior to such delivery it "had been requested by, or on behalf of a person having a right of property or possession in the goods not to make such delivery." And before delivery had been made the carrier had been requested by one entitled to make the request not to make delivery to Taub.

[5] There is absolutely no proof in the record that the delivery of the fruit by the railroad company to the storage company was intended by the carrier as a delivery of possession or of control to Taub. And if it had done so the railroad company would have lost its lien for its freight charges on the goods, according to a decision of the Supreme Judicial Court of Massachusetts in New York Central & Hudson River Railroad Co. v. York & Whitney Co., 230 Mass. 206, 119 N. E. 855. The fruit was delivered to the storage company between October 26th and October 30th, and the diversion orders had been received prior to October 26th, and they required the railroad company to change the billing of the fruit to "Yakima Trust Co., advise Louis Taub." The deposit was made not by Taub, or for Taub. It was made by the railroad company as bailee for it. And it was the duty of the railroad company, after the fruit had been inspected and checked, and the shipping documents had been examined and the freight paid, to have advised the storage company to deliver the fruit to the lawful consignee, which was not Taub, but the trust company.

[6] The claim of the storage company to a lien rests upon section 28 of the Warehouseman's Act of the state of New Jersey. That act gives a general lien for storage charges "against all goods belonging to others which have been deposited at any time by the person who is liable as debtor for the claims in regard to which the lien is assert-

ed, if such person had been so intrusted with the possession of the goods that a pledge of the same by him at the time of the deposit to one who took the goods in good faith for value would have been valid." P. L. N. J. 1907, p. 348; 4 Comp. Stat. N. J. p. 5781.

At the argument in this court the respondent's counsel rested the claim of the storage company to a lien on the provision above cited. We do not consider it necessary, therefore, to examine any of the other provisions contained in the act. The claim of the storage company may be stated in concrete form as follows: If A. deposits his goods in a warehouse, and removes them without paying the warehouseman's charges, and thereafter other goods are deposited by him, which either belong to him or which he has a right to pledge, the warehouseman has a lien on such goods for the unpaid storage charges on the goods previously withdrawn.

The proposition is in flat contradiction of the common law. In Richardson v. Goss, 3 Bos. & Pul. 119, 123, Lord Chief Justice Alvanley said: "Suppose a wharfinger to have a general authority to receive all goods directed for A., and that goods come to his wharf by mistake directed for A. It is quite clear that the real owner of the goods could not take them away without paying the charges incident to those particular goods; but it is equally clear that the wharfinger could not set up a lien on such goods for a general balance of accounts due from A. to him."

In the above case A., in Newcastle, shipped goods to London to order of B., and before their arrival was informed by B. that he was in failing circumstances and would not apply for the goods on their arrival. A. immediately started for London, and on arriving at the wharf tendered the freight and charges and demanded delivery of the goods by the wharfinger. It was refused, unless A. paid to the wharfinger a general balance due from B. The court, in a unanimous opinion, held that the wharfinger had no right to retain the goods for a general balance due to him from B. And Chambre, J., said: "If there be any case in which it would be justifiable to strain the law for the purpose of supporting a lien, yet I do not think that there is any reason for doing so in this; for if this defense be sustained the effect will be that we shall direct the debts of one man to be paid by the effects of another."

The case above cited was decided in 1802.

It has since been regarded as correctly stating the rule of common law. There is no doubt that the lien was specific, and not general, being restricted to the charges due on the specific goods in the warehouseman's possession at the time, and that it did not include general charges and expenses incurred in respect to other goods no longer in the warehouseman's possession. The common-law lien has been in many states extended by statute, so as to give a general rather than a specific lien. This was done in New York. Stallman v. Kimberly, 121 N. Y. 393, 24 N. E. 939. And it was done in New Jersey. There is no doubt that the New Jersey Uniform Warehouse Receipts Law gives a general rather than a specific lien.

The difficulty in this case is, so far as the lien claimed by the storage company is concerned, that the goods deposited in the warehouse were not, as we have already seen, deposited there by Taub, but by the railroad company, and Taub at no time had possession of the goods, and at no time did he have any right to pledge the goods. That had been done by Small when he negotiated with the trust company the advances it made, which advances were secured by the delivery to it of the bills of lading.

The goods, when deposited by the railroad company, did not belong to Taub, the person who was liable as debtor for the claim to which the lien was asserted. Therefore this case is not within subdivision (a) of section 28. And at the time the goods were deposited Taub, who was the person liable as debtor for the claim in regard to which the lien is asserted, was not so intrusted with the possession of the goods that a pledge of the same at that time to one taking the goods in good faith and for value would have been valid. Therefore this case is not within subdivision (b) of section 28.

[7] It is plain that, as Taub was named in the bills of lading as the consignee of the goods, the legal title was in him. Small was Taub's copartner in the adventure, and in dealing with the trust company in negotiating for the advances he was acting for Taub, as well as for himself. It may be, therefore, that when Small, acting for himself, and his copartner, Taub, transferred the straight bill of lading to the trust company, the latter became vested with the legal title to the goods as effectually as if Taub had transferred it. But it is not necessary to the decision of this case to decide that question, and we do not decide it. It is clear, however, that under section 32 of the

Pomerene Act (Comp. St. § 8604pp) the transferor of the straight bill of lading, or the trust company as transferee, had the right to notify the carrier not to make delivery to Taub.

Order reversed, and the court is instructed to enter an order directing the payment of $3,782.28 to the trust company.

HAND, Circuit Judge, concurs in the result.