## ESTHERVILLE PRODUCE CO. v. CHICAGO, R. I. & P. R. CO.

## CHICAGO, R. I. & P. R. CO. v. ESTHERVILLE PRODUCE CO.

### Nos. 9276, 9264.

Circuit Court of Appeals, Eighth Circuit.
Feb. 25, 1932.

Rehearing Denied April 5, 1932.

D. M. Kelleher, of Ft. Dodge, Iowa (Goheen, Goheen & Neuzil, of Cahnar, Iowa, on the brief), for Estherville Produce Co.

R. L. Read, of Des Moines, Iowa (J. G. Gamble and A. B. Howland, both of Des Moines, Iowa, on the brief), for Chicago, R. I. & P. R. Co.

Before KENYON, VAN VALKENBURGH and GARDNER, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

The Estherville Produce Company, a co-partnership composed of H. D. Hinsch and Frank Koch, and suing as a firm under local practice, was engaged in the poultry and egg business at Estherville, Iowa. One of its regular customers, the commission firm of Levit & Woorman, had a place of business at 345 South Front street in Philadelphia, Pa., but usually received shipments on track 7-A, Pier 62 South, in said city. The produce company had had dealings with this Philadelphia firm for a period of about six months prior to November, 1928, during which time goods had been shipped directly to Levit & Woorman as consignee. Early in November it determined to make a change in the method of consignment, with the object, as Mr. Koch states, "to assure ourselves, to make sure, that that property belonged to us until it was paid for." This purpose was communicated to Levit & Woorman by telephone prior to November 6, 1928. On the last-mentioned date the produce company shipped a car of live poultry to Philadelphia. The Chicago, Rock Island & Pacific Railroad was the initial carrier, and one Anthony Stoery was the agent in charge of its offices at Estherville. The circumstances attending this consignment are best stated in the language of Mr. Hinsch, whose testimony in this regard is uncontradicted:

"I think all of our shipping transactions went through the same man, through Stoery.

The transaction of November 16, 1928, and the prior transactions were had on the railroad premises, in the office of the freight depot. The freight depot at Estherville is just across the tracks, I think, from the passenger depot. Estherville is a city of a little better than 5,000 population. I had a conversation with Anthony Stoery at or about the time of these transactions of November 6, 1928, and I talked to him with regard to the shipment we wished to make or were about to make. I told Mr. Stoery that I wanted to bill this car to ourselves at Philadelphia, and I would like to have an order bill of lading; a yellow bill of lading, whereon he told me that we could not ship poultry, live poultry, with an order bill of lading; we would have to use the common bill of lading. That wasn't something I said. He told me we would have to use the common bill of lading. So I told him that they would have to bill it that way but we wanted them billed to ourselves so it was our poultry when it got to Philadelphia.

\* \* \*

"Q. What further was said about the shipment? A. I told him I would like to have him put on 'Notify Levit & Woorman when this shipment reaches Philadelphia', and he said he couldn't put that on, but he would put on 'Spot at' or 'In care of' and I told him I didn't care, just so the poultry would be ours on arrival in Philadelphia."

The bill of lading issued for this shipment of November 6, 1928, was a uniform straight bill of lading. In it the Estherville Produce Company was named as consignor and consignee, the destination was Philadelphia, Pa., and on it was this notation: "Spot at Levit & Woorman, 345 So. Front St., Philadelphia, Penn."

The produce company procured a draft for the amount of the shipment, and forwarded it, with this bill of lading attached, to a Philadelphia bank for collection. In this draft the payor was named as "Levit & Woorman, 345 So. Front St., Philadelphia, Pa." Upon arrival, in due course in Philadelphia, the car was placed on track 7-A, Pier 62 South, where, as has been said, Levit & Woorman usually received shipments of poultry. On November 12, 1928, the demurrage clerk for the Baltimore & Ohio Railroad, the receiving carrier, notified Levit & Woorman by mail of the car's arrival. In this notice Levit & Woorman were named as consignee. Upon receipt of this notice Levit & Woorman, by telephone and letter, instructed the Baltimore & Ohio to direct this car "to the same consignee at Weehawken, N. J., Erie R. R. delivery." The directions for this reconsignment were given on a new memorandum waybill, showing the new destination. The destination on the original bill of lading was not changed. No new bill of lading was issued, and the railroad did not demand nor receive the old one. Concerning this transaction, Woorman, of the Philadelphia commission firm, testified that this car "was diverted by me to Weehawken, N. J. and sold to Julius Kastein. That is, he handled it on consignment and paid our firm for it." Levit & Woorman, however, did not pay the Estherville Company. It was not until early in December that that company was advised that its draft had not been paid. January 9, 1929, Levit & Woorman were adjudged bankrupts. The produce company proved up its claim. A composition settlement was effected whereby it received a 10 per cent. dividend in cash, and 15 per cent. of its claim in notes. It brought suit against the Chicago, Rock Island & Pacific Railroad Company, appellee in cause No. 9276, to recover for the alleged wrongful diversion and resulting conversion of this car of poultry. At the trial the District Court directed a verdict in favor of the railroad upon the transaction above described, which formed the subject-matter of the first count of the petition of the produce company. It is to review the resulting judgment that this appeal in No. 9276 is taken.

The second count of the produce company's petition has to do with a second shipment by it to Philadelphia on November 13, 1928. This was pursuant to a telephone conversation on the tenth or eleventh of November between Koch and Woorman, as a result of which the latter sent to Estherville a caretaker named Williams to accompany the shipment. The produce company was named as consignor and consignee in a uniform straight bill of lading upon which appeared the following notation: "In care of Levit & Woorman, 345 So. Front St., Philadelphia, Penn."

En route, at Blue Diamond, Ill., Williams received instructions from Levit & Woorman by telegram to direct the car to Bridgeport, Conn., via New York Central Railroad. Williams executed a written order accordingly. The car, thus diverted, proceeded to Bridgeport, and was there unloaded by Levin Bros., to whom Levit & Woorman had sold the poultry. As before, a draft with bill of lading attached had been sent to a Philadelphia bank for collection, but this draft was never paid. Through the composition in

bankruptcy above described, the produce company received a cash dividend of 10 per cent. and 15 per cent. in notes upon its claim against Levit & Woorman. It brought suit against the initial carrier to recover for the diversion and conversion of its property as above stated, this transaction forming the subject-matter of the second count of its petition. At the trial below, this count was submitted to the jury, which returned a verdict against the railroad, appellant in cause No. 9264. We shall dispose of this last-named controversy first.

In their brief, counsel for the railroad argued that, since Levit & Woorman were named in a straight bill of lading as the party in whose care the shipment was sent, they had a right to receive the car, and the railroad had a right to deliver it to them without surrender of the bill of lading; that the carrier was authorized to accept their order as to the place of delivery; that the car was in fact delivered to the party for whom it was intended, and that the fact that this delivery was made at Bridgeport instead of at Philadelphia is of no materiality.

█ It is to be kept in mind that, in this straight bill of lading the produce company was named both as consignor and consignee, thus, in any view, retaining ownership and control of the shipment until it reached its destination, and even there before delivery had been made and possession parted with. Hinrichs, Inc., v. Standard Trust & Savings Bank (C. C. A. 2) 279 F. 382; In re Nesto (C. C. A. 3) 270 F. 503, 507; Continental Nat. Bank v. Tremont Trust Co. (C. C. A. 1) 4 F.(2d) 219; In re Taub (C. C. A. 2) 7 F.(2d) 447, 451, 452; Southern Express Co. v. Dickson, 94 U. S. 549, 24 L. Ed. 285; Emmons Coal Mining Co. v. Norfolk & W. Ry. Co. (C. C. A. 3) 3 F.(2d) 525.

█ A diversion in transit, at the direction of the party in whose care the shipment is consigned, is not a delivery in accordance with the terms of the contract between shipper and carrier.

"Where the consignor is known to the carrier to be the owner, the carrier must be understood to contract with him only, for his interest, and upon the terms he dictates in regard to the delivery." Cooper, Jr., v. Bank of British North America (C. C. N. Y.) 30 F. 171, 173, citing Southern Express Co. v. Dickson, 94 U. S. 549, 550, 24 L. Ed. 285, which uses the language quoted and returns a negative answer to the following: "The question is, rather, where it is known that the goods are the property of the ship-per, and have been shipped by him for delivery to the consignees as his agents at a distant place, can the carrier deliver the goods to such consignees or to their order at another place, or without starting them on their journey?"

█ It is held that the consignees there (and, it would follow, Levit & Woorman, in whose care the shipment was made, here) "are to be regarded simply as agents selected by him (consignor) to receive the goods at a place indicated." Here the ownership of the goods in the shipper was known to the carrier, both presumptively from the terms of the bill of lading, and actually, by express information to the carrier's agent at point of shipment. 4 Elliott on Railroads (3d Ed.) par. 2136, p. 500. The carrier, therefore, knew that the authority of the persons in whose care the goods were sent was limited to a specific purpose; that is, to receive the shipment at destination. By diverting the goods at an intermediate point, although ordered or directed to do so by those in whose care the poultry was addressed, it rendered itself liable for conversion. 10 Corp. Jur. par. 374, p. 261; 1 Hutchinson on Carriers (3d Ed.) § 177, p. 192; Ryan v. Great Northern Ry. Co., 90 Minn. 12, 95 N. W. 758; Thompson, Felde & Co. v. Great Northern Ry. Co., 142 Minn. 60, 170 N. W. 708; McNeill v. Wabash Ry. Co., 207 Mo. App. 161, 231 S. W. 649; Southern Express Co. v. Dickson, supra.

"The duty of the carrier is not merely to convey safely the goods intrusted to it, but also to deliver them to the party designated by the terms of the shipment, or to his order, at the place of destination. This duty to deliver to the proper person is absolute. If the carrier delivers goods to a person not entitled to receive them it is liable to the person who is entitled to them for conversion, rendering it immediately liable, regardless of a subsequent destruction of the goods by act of God, and irrespective of its good faith in making the delivery. No question of care arises, for in such case the carrier acts at its peril and is liable regardless of negligence." 10 Corp. Jur., par. 377, pp. 262, 263.

It is true that Woorman, a witness for the railroad company, testified that he obtained authority from Mr. Koch of the Estherville Produce Company to make this diversion to Bridgeport. This was denied by witnesses for the produce company. The issue was submitted to and finally resolved by the jury.

At the hearing in this court counsel for the railroad practically conceded that the diversion in transit was not justified under the terms of the contract of shipment, but urged that the loss sustained by the produce company was not caused by, or a proximate result of, the diversion of the car to Bridgeport, but resulted solely because of the failure of Levit & Woorman to pay for the car of poultry. This argument seems to be met by the text above quoted and by decision. Missouri, K. & T. Ry. Co. v. Seley, 31 Tex. Civ. App. 158, 72 S. W. 89. The conversion took effect immediately upon the unwarranted diversion. We are not permitted to ignore the legal effect of that act, which vested at once a cause of action in the produce company of which it could not be divested by the subsequent financial irresponsibility of the Philadelphia commission firm, nor by speculation concerning possible future happenings. We think the judgment upon this second count is sustained by the record.

We now take up the appeal in cause No. 9276 from the judgment entered upon count I of the produce company's petition. For a better understanding of the responsibilities of carriers in situations such as are here presented, it is desirable to examine the statutes defining straight bills of lading and governing deliveries made thereunder.

"Straight bill of lading. A bill in which it is stated that the goods are consigned or destined to a specified person is a straight bill." 49 USCA. § 82, p. 390.

"Delivery; when justified. A carrier is justified, subject to the provisions of the three following sections, in delivering goods to one who is—

"(a) A person lawfully entitled to the possession of the goods, or

"(b) The consignee named in a straight bill for the goods, or

"(c) A person in possession of an order bill for the goods, by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee, or by the mediate or immediate indorsee of the consignee." 49 USCA § 89, p. 396.

"Liability for delivery to person not entitled thereto. Where a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by subdivisions (b) and (c) of the preceding section; and, though he delivered the goods as authorized by either of said subdivisions, he shall be so liable if prior to such delivery he—

"(a) Had been requested, by or on behalf of a person having a right of property or possession in the goods, not to make such delivery, or

"(b) Had information at the time of the delivery that it was to a person not lawfully entitled to the possession of the goods." 49 USCA § 90, p. 399.

At the outset Mr. Hinsch, for the produce company, requested a yellow, or order, bill of lading. He was properly advised that, under the provisions of the applicable tariff, he could not ship live poultry on an order bill. He next asked the words "Notify Levit & Woorman when this shipment reaches Philadelphia" to be placed on this bill, but was told that this also was impossible. The shipper, therefore, received a straight bill of lading, and the rights of the parties must be determined in accordance with the law applicable to a shipment of that character. A white, or straight, bill of lading cannot be made a substitute for a yellow, or order, bill, unless notice is brought home to the carrier. Utley v. Lehigh Valley R. Co., 292 Pa. 251, 141 A. 53.

It would seem, then, that the authority of Levit & Woorman, "as agent of the shipper," to receive the goods, and the right of the carrier in effect to deliver to them, must depend upon the significance of the notation, "Spot at Levit & Woorman, 345 So. Front Street, Philadelphia, Penn." In view of the fact that there were no tracks at No. 345 South Front street upon which cars could be placed, we may disregard the departure from this notation in spotting the car on track 7–A, Pier 62 South, at which point Levit & Woorman usually received shipments of poultry. We must be governed by the legal import of the contract of shipment in its entirety, and this requires construction of the words "Spot at," as noted upon the bill of lading. The trial court was of opinion that this notation made the bill ambiguous, and admitted testimony as to the circumstances surrounding the making of the bill, and as to the meaning of the term "Spot at." But three witnesses testified with respect to the effect of this term. Mr. Craver, diversion and reconsignment clerk with the Reading Company in its Terminal at Philadelphia, gave this testimony:

"Q. Does the term 'spot' as applied to cars which are being handled have a partic-

ular designation, or is it generally accepted as meaning a certain thing among those engaged in railroad business in Philadelphia, Pennsylvania, and elsewhere? A. To 'spot' means, when the operating department gets a car consigned to a certain concern, for instance, in Philadelphia, as soon as the car comes in, the car is spotted, placed on the concern's private siding or on a public delivery track.

"Q. What particular significance is attached to the term 'spot'? What does it mean with respect to the completed delivery or setting of the car at the point where it is to be taken by the consignee? A. It means, when you spot a car, you get the car and place it for delivery.

"2. In other words, what is the usual significance of the term 'spot' with respect to final placing for purposes of delivery? A. There may be a freight train coming in containing cars for various industries. Those cars are spotted, picked up for the various industries and placed for the individual sidings or public tracks.

"Q. When are they said to be spotted with respect to the time that they are placed at the point of final delivery? A. They are spotted when they are placed for delivery.

"Q. If a shipment is made on a straight bill of lading, with a consignee given in care of someone else, what is the custom with respect to requiring an order from the in-care-of party? A. We would accept an order from the in-care-of party."

■ To all these questions counsel for the produce company interposed objections, and exceptions were preserved to the court's rulings. Analysis shows that the answers of the witness shed no light upon the meaning of the words "spot at." The car was not consigned to Levit & Woorman; spotting a car at a point for delivery does not amount to delivery, nor determine the party authorized to receive the shipment. Goods may ultimately be intended for a concern which receives shipments at a designated spot, but placing a car at that point does not accomplish delivery contrary to the statutory requirements of the contract of shipment. This straight bill of lading contains no "in-care-of" notation, unless "Spot at" has that meaning, concerning which the testimony of this witness contains no competent information. The statement of what the witness or his company would do in a given case is incompetent to shed light upon that question. In our judgment this testimony was largely, if not entirely, incompetent upon the point at issue, and certainly does not tend to establish the significance of the notation under consideration.

Mr. Lowen, a general clerk for the Baltimore & Ohio Railroad at Philadelphia, after stating that his duties required him to notify the consignees of arrival of shipments, that he received shipments of poultry from the Estherville Produce Company consigned to Levit & Woorman during November, 1928 (evidently referring to the shipment in controversy); and that he notified "all consignees on all poultry cases," was asked the following hypothetical question: "Assume that a shipment of live poultry is consigned by the Estherville Produce Company to the Estherville Produce Company at Philadelphia, Pennsylvania, the shipment moving under a straight bill of lading similar to Exhibit 'A' attached to the plaintiff's petition—the standard straight bill of lading—bearing notation, 'Spot at Levit' Woorman, 345 Front Street, Philadelphia, Pennsylvania. Upon the arrival of a car, moving under a straight bill of lading, similar in form to the one which I have just outlined, state whether or not you would release a car moving under such a bill of lading to Levit & Woorman?" To which he made the following answer: "I would release such a car to Levit & Woorman."

Of course the car in question was not consigned to Levit & Woorman, and the answers of this witness, subjected to objection with exception preserved, were incompetent and ineffective to attach significance to the term "Spot at."

Mr. S. R. Lauer, an employee of the Pennsylvania Railroad Company, was asked the following question: "Do you consider the meaning of the provision, spot at Levit & Woorman, 345 South Front Street, Philadelphia, Pennsylvania, appearing on Exhibit 'A' attached to plaintiff's petition, to be the equivalent of the notation, 'In care of Levit & Woorman, 345 South Front Street', which notation appears on Exhibit 'B' attached to the plaintiff's petition?" To this question counsel for plaintiff objected. The objection was overruled, and an exception preserved. The witness answered, "Personally, I would, yes." This testimony does not even tend to establish a custom, or a prevailing interpretation of the words "Spot at" as generally understood in railroading. The expression is referred to elsewhere in the testimony as a "mere switching term," used to designate the point where a car is to be placed for subsequent delivery

and unloading. Missouri Pac. R. Co. v. Skipper, 174 Ark. 1083, 298 S. W. 849.

"A party must be shown either to have had actual knowledge of a general usage of trade among carriers, or it must be shown to have been so general and notorious that he must be presumed to have known it. In the case of the usage of a particular carrier actual knowledge must be shown." 17 Corp. Jur., par. 25, p. 464.

Upon this question the following language of the Supreme Court in North Pennsylvania Railroad Co. v. Commercial Bank of Chicago, 123 U. S. 727, loc. cit. 738, 8 S. Ct. 266, 272, 31 L. Ed. 287, is pertinent: "The fact that the railroad company at Philadelphia had been in the habit of delivering cattle transported by it to the Blakers through the drove-yard company, without requiring the production of any bill of lading or receipt of the carrier given to the shipper, or any authority of the shipper, in no respect relieves the company from liability for the cattle in this case. It was not shown that the shipper, or the bank which took the draft against the shipment, or its correspondent at Newtown in Pennsylvania, had any knowledge of the practice, and therefore, if any force can be given to such a practice in any case, it cannot be given in this case, where the party sought to be affected had no knowledge of its existence." See, also, Baltimore & O. R. Co. v. Jones & Laughlin Steel Co., 138 Md. 604, 114 A. 730; Weyand v. Atchison, T. & S. F. Ry. Co., 75 Iowa, 573, 39 N. W. 899, 1 L. R. A. 650, 9 Am. St. Rep. 504; Adrian Knitting Co. v. Wabash Ry. Co., 145 Mich. 323, 108 N. W. 706.

The trial judge had before him no competent testimony to aid in arriving at the significance of these words in their application to the issue presented. He therefore had recourse to what he conceived to be the intention of the parties. That intention, if important, seems to us to have been misconceived if it was thought to contemplate delivery to Levit & Woorman before payment was made. In its ruling, sustaining the railroad's motion for judgment on count I, the court laid stress upon the fact that the produce company had no one in Philadelphia to receive the shipment, and said: "I am constrained to the opinion that as to the car described in Count One, the railroad carrier was justified in a delivery to Levit & Woorman, at least if no countermand or other notice or information came to them, if it did, before the time of delivery. It is true the

billing indicated that the Estherville Produce Company was the owner, and the carrier would have been bound to respect its orders at least until final delivery. I think 'Spot at', if it were to give it any meaning at all must mean to deliver at. It was carload lot commodity; it was not to be unloaded by the railway, the carrier; it was to be unloaded by those entitled to receive delivery. Spotting the car at the point of delivery and notifying the one entitled to delivery is all that the carrier could do to complete its contract."

It was thus conceded that the produce company was the consignee and owner, that the carrier was bound to respect its orders, and to notify the one entitled to delivery. The one, so entitled, was the consignee named in the bill of lading, and the fact that the consignee was not present in Philadelphia, nor represented there, presented no insuperable difficulty.

■ In North Pennsylvania Railroad v. Commercial Bank, 123 U. S. 727, 8 S. Ct. 266, 270, 31 L. Ed. 287, the course to be pursued in such a situation is thus stated:

"If the consignee is absent from the place of destination, or cannot, after reasonable inquiries, be found, and no one appears to represent him, the carrier may place the goods in a warehouse or store with a responsible person to be kept on account of and at the expense of the owner. He cannot release himself from responsibility by abandoning the goods, or turning them over to one not entitled to receive them. Fisk v. Newton, 1 Denio [N. Y.] 45 [43 Am. Dec. 649]. If the freight consist, as in this case, of livestock, the carrier will not, under the circumstances mentioned,—that is, when the consignee is absent or cannot after reasonable inquiries be found, and no one appears to represent him,—relieve himself from responsibility by turning the animals loose. He must place them in some suitable quarters where they can be properly fed and sheltered, under the charge of a competent person as his agent, or for account and at the expense of the owner. Turning them loose without a keeper, or delivering them to one not entitled to receive them, would equally constitute a breach of duty for which he could be held accountable. These principles are firmly established by the adjudicated cases, and rest upon obvious grounds of justice. Ang. Carr. § 291. * * *

"Want of notice is excused when the consignee is unknown, or is absent, or cannot be found after diligent search; and if,

after inquiry, the consignee or the indorsee of the bill of lading for delivery to order cannot be found, the duty of the carrier is to retain the goods until they are claimed, or to store them prudently for and on account of their owner. He may thus relieve himself from the carrier's responsibility: He has no right under any circumstances to deliver to a stranger."

See, also, Wall v. American Ry. Express Co., 220 Mo. App. 989, 993, 272 S. W. 76; Merchants' & Miners' Transp. Co. v. Branch (C. C. A. 4) 282 F. 494.

For expense thus incurred the carrier is entitled to be reimbursed. In this case the consignor was also named as consignee. Its address was well known, and to it, we think, immediate notice should have been given. The reconsignment in Philadelphia at the direction of Levit & Woorman, neither owner nor consignee entitled to possession, was in effect a delivery to them (Pere Marquette Ry. v. French & Co., 254 U. S. loc. cit. 543, 41 S. Ct. 195, 65 L. Ed. 391), and an unauthorized delivery, rendering the carrier liable as for conversion. The rights of the parties must be determined by the law governing their contract of shipment as revealed in statute law and controlling decision. We think the trial court erred in directing a verdict for the railroad on count 1 of the petition, and in rendering judgment accordingly.

It follows from the foregoing that the judgment upon count 2 will be affirmed, and that upon count 1 reversed. Count 1 is remanded for further proceedings not inconsistent with the views herein expressed. It is so ordered.